COURT
OF APPEALS

                                       SECOND
DISTRICT OF TEXAS

                                                   FORT
WORTH

 

                                        NO.
2-03-294-CV

 

 

ERNEST REYNOLDS, III                                                         APPELLANT

 

                                                   V.

 

MICHAEL MURPHY A/K/A AND F/K/A                                      APPELLEES

JOHN
MICHAEL MURPHY AND PHILLIPS

INVESTMENT
RESOURCES, L.L.C.

 

                                              ------------

 

            FROM
THE 17TH DISTRICT COURT OF TARRANT COUNTY

 

                                              ------------

 

                                OPINION
ON REHEARING

 

                                              ------------

After reconsidering our prior
opinion on appellant Ernest Reynolds III=s motion for rehearing and request for rehearing en banc, we deny the
motion and request for rehearing en banc, but we withdraw our July 14, 2005
opinion and judgment and substitute the following in their place in order to
clarify and correct parts of our original opinion.[1]








Introduction








This case of first impression involves the potential liability of an
author and publisher of an investment-related newsletter to a subscriber who
alleges that he incurred losses as a result of making investments in accordance
with recommendations in the newsletter. 
Appellant Ernest Reynolds, III appeals from a summary judgment granted
in favor of appellees Michael Murphy a/k/a and f/k/a John Michael Murphy and
Phillips Investment Resources, L.L.C. 
Reynolds challenges the summary judgment in nine issues, complaining
specifically that (1) the United States Supreme Court holding in Lowe v.
Securities and Exchange Commission,[2]
protecting publishers from prior restraint of free speech by federal agencies,
does not extend to abolish all private causes of action for the consequences of
a misuse of speech, (2) the limited First Amendment protection of Lowe
should not be extended to shield publishers and nonpublisher authors of harmful
speech from liability for their actions, (3) the no-evidence motion for summary
judgment was premature, (4) the trial court abused its discretion by denying
Reynolds=s motion for continuance because the discovery deadline had not passed
and appellees refused to adequately respond to discovery, (5) Reynolds
presented sufficient evidence on each of his causes of action to defeat
appellees= no-evidence
motion for summary judgment, (6) Reynolds established genuine questions of material
fact as to each challenged element of his various causes of action,[3]
(7) the trial court erred by considering appellees= objections to Reynolds=s evidence filed for the first time on the date of the motion for
summary judgment hearing, (8) the trial court erred by its evidentiary rulings,
and (9) the trial court erred by denying Reynolds=s motion to reform the order. 
We affirm in part and reverse and remand in part.








 

Background

In 1999, Reynolds received an advertisement for Technology
Investing, a newsletter published by Phillips and authored by Murphy.  Reynolds ordered a subscription by phone and
began receiving the newsletter as well as supplemental faxes and email
bulletins.  In his pleadings, Reynolds
alleges that he relied on the newsletter for Aresearch and information in making investment decisions@ and that he attempted to follow the advice given in the newsletter.[4]  Reynolds also alleges in his pleadings that
in 2001 he became concerned about the advice he was receiving in the
newsletter.  Specifically, he was not
seeing the returns on his investments that the newsletter described.  Eventually, he sold those stocks at a loss
despite Murphy=s
recommendation to hold the stock as a long-term investment.[5]








Reynolds sued appellees for breach of contract, negligence, negligent
misrepresentation, fraud and misrepresentation, and violations of the Texas
Deceptive Trade Practices Act[6]
(DTPA).  Appellees filed no-evidence and
traditional motions for summary judgment. 
The trial court granted summary judgment for appellees without stating
the grounds upon which the judgment was based.

Procedural Issues








Reynolds appeals several procedural matters, some of which we must
address before turning to the substance of the summary judgment issues.  Appellees filed both a no-evidence and a
traditional motion for summary judgment. 
Several of Reynolds=s complaints relate to the discovery process; Reynolds contends
generally that appellees stonewalled him during discovery and that he did not
have enough time to complete discovery and obtain evidence to defeat the
no-evidence motion, through no fault of his own.[7]  Although when both no-evidence and
traditional summary judgment motions are filed we usually address the
no-evidence motion first, see Ford Motor Co. v. Ridgway, 135 S.W.3d 598,
600 (Tex. 2004), here we will review the propriety of granting the traditional
summary judgment first because it is dispositive of the majority of Reynolds=s claims.[8]  Therefore, we need not address Reynolds=s third through fifth, and the part of Reynolds=s ninth, issues pertaining to 
discovery matters.  See Tex. R. App. P. 47.1; Tex. Mut. Ins.
Co. v. Surety Bank, N.A., 156 S.W.3d 125, 131 n.4 (Tex. App.CFort Worth 2005, no pet.).








The remainder of Reynolds=s ninth issue relates to whether the trial court should have granted
Reynolds=s motion to reform the judgment to specify the grounds upon which it
granted summary judgment.  We find no
authority, nor does Reynolds cite any, requiring a trial court to specify the
grounds upon which it grants summary judgment. 
Cf. Provident Life & Accident Ins. Co. v. Knott, 128 S.W.3d
211, 215 (Tex. 2003) (citing long-standing rule that trial court order granting
summary judgment without specifying grounds must be affirmed if any theories
presented to trial court and preserved for appellate review are
meritorious).  Thus, we overrule the
remainder of Reynolds=s ninth
issue and turn to his evidentiary and discovery issues.

Reynolds=s seventh
and eighth issues complain about the trial court=s rulings on the parties= summary judgment evidence.  The
trial court denied Reynolds=s objections to appellees= evidence and granted appellees= objections to Reynolds=s evidence.  A trial court=s rulings admitting or excluding evidence are reviewable under an
abuse of discretion standard.  Nat=l Liab. & Fire Ins. Co. v. Allen, 15
S.W.3d 525, 527 (Tex. 2000).  An
appellate court must uphold the trial court=s evidentiary ruling if there is any legitimate basis in the record
for the ruling.  Owens-Corning
Fiberglas Corp. v. Malone, 972 S.W.2d 35, 43 (Tex. 1998).  

 








In his seventh issue, Reynolds claims that the trial court erred by
considering appellees= objections
to his responsive summary judgment evidence because their objections were
untimely filed.  Appellees did not file
their objections to Reynolds=s evidence until the day of the summary judgment hearing.  Generally, the nonmovant must file its
response or reply (including any objections to the movant=s evidence) Anot later
than seven days prior to the day of [the] hearing.@  Tex. R. Civ. P. 166a(c). 
A movant=s exceptions
to the nonmovant=s response
or reply should be filed at least three days before the hearing.  Tex.
R. Civ. P. 21, 91; McConnell v. Southside ISD, 858 S.W.2d 337,
343 n.7 (Tex. 1993).[9]  But a movant=s objections to the competency of a nonmovant=s evidence that are filed the day of the hearing are not untimely and
may be considered and ruled upon by the trial court.  Shelton, 144 S.W.3d at 119.  Thus, we overrule Reynolds=s seventh issue.













In his eighth issue, Reynolds contends that the trial court erred by
granting appellees= objections
to his summary judgment evidence and by denying his objections to some of
appellees=
evidence.  As an initial matter, we need
not determine if the trial court abused its discretion by denying Reynolds=s objections to appellees= summary judgment evidence because, as we explain below, even
disregarding that evidence, Reynolds did not raise a fact issue on appellees= summary judgment grounds.  See
Tex. R. App. P. 47.1.  As to appellees= objections to Reynolds=s evidence, which the trial court granted in its order granting
summary judgment, Reynolds presented the following items as summary judgment
evidence:  his affidavit, a set of
requests for admissions that he claimed were deemed, an excerpt from a
publication entitled Overpriced Stock Service, and a copy of an article
purporting to be from TheStreet.com. 
Appellees timely objected to the purported deemed admissions, claiming
that they were not deemed because appellees timely filed a motion for
protective order with respect to the requests within the thirty-day period set
forth in the rules.  See Tex. R. Civ. P. 192.4, 192.6, 198.2; In
re Edge Capital Group, Inc., 161 S.W.3d 764, 766-67 (Tex. App.CBeaumont 2005, orig. proceeding) (noting that trial court has
discretion to narrow scope of discovery to protect party=s legitimate interests, but also acknowledging rule 192.6's
admonishment that a motion for protective order should not be filed when an
objection or assertion of privilege is appropriate).  Reynolds claims that the motion for
protective order did not prevent the requests from being deemed admitted
because the trial court never ruled on the motion.  Thus, Reynolds contends that appellees= supplemental response was their first one, that it was untimely, and
that the admissions were deemed admitted. 
We disagree.

A Aparty must
state specifically the legal or factual basis for [its] objection [to
propounded discovery] and the extent to which the party is refusing to comply
with the request.@  Tex.
R. Civ. P. 193.2(a).  An objection
that is not made within the time required by the discovery rules or by court
order, or that is obscured by numerous unfounded objections, is waived unless
the court excuses the waiver for good cause shown.  Tex.
R. Civ. P. 193.1, 193.2(e).  A
party from whom discovery is sought may also, within the time for a response,
move for a protective order.  Tex. R. Civ. P. 192.6(a).  A party should not move for protection when
an objection is appropriate, but a motion for protective order does not waive
any objections.  Id.  A trial court may grant a protective order to
protect a party from Aundue burden,
unnecessary expense, [or] harassment.@  Tex. R. Civ. P. 192.6(b).








Appellees claimed in their motion for protective order that the 996
requests for admissionsCReynolds=s third setCwere unduly
burdensome and harassing.[10]  In addition to their general contention,
appellees objected to some of the admissions on specific grounds.  After the thirty-day period expired,
appellees filed what they called a supplemental response, answering some of the
admissions and objecting to others.  The
trial court never ruled on the motion for protective order.  








Appellees= summary
judgment evidence shows that in addition to the motion for protective order,
which was filed on May 20, 2003, appellees also attached to the motion answers
to the requests that asserted appellees= general objectionsCthat the volume of the requests was unduly burdensome and harassingCand also contained more specific objections to certain, but not all,
of the requests.  Reynolds contends that
the general objections were not sufficient to constitute a complete
response.  See Tex. R. Civ. P. 193.1.  But when a party has objected to a large set
of requests for admissions on the ground that the volume of the requests is
unduly burdensome and harassing, requiring that party to file a more specific
objection to each request to prevent the admissions from being deemed would
defeat the purpose of filing such a general objection, a motion for protective
order, or both, which are expressly authorized by the rules.  See Tex.
R. Civ. P. 192.6(b), 193.2(b); cf. Grass v. Golden, 153 S.W.3d
659, 662 (Tex. App.CTyler 2004,
orig. proceeding) (noting that under rule 192.6(a), party seeking protection
from time and place of discovery must state a reasonable time and place
for discovery with which it will comply). 
Moreover, Reynolds cites no authority in his brief directing us to hold
otherwise.  See, e.g., Shelton,
144 S.W.3d at 119 (waiving point on appeal for failure to cite authority).  He does not cite any authority, nor have we
found any, holding that the filing of a motion for protective order within the
time period for answering requests for admissions is not sufficient to prevent
those admissions from being deemed admitted if the court does not eventually
rule on the motion.  See id.  We hold that appellees= motion for protective order, along with their attached general
objections to the requests for admissions on the ground that they were unduly
burdensome and harassing, was adequate and prevented the admissions from being
deemed under rule 198.  Tex. R. Civ. P. 198.  Thus, contrary to Reynolds=s assertions, there was no need for a trial court order Aundeeming@ the
admissions because they were never deemed admitted in the first place.  We conclude that the trial court did not
abuse its discretion by concluding that the requests were not deemed admitted
and by granting appellees= objections
to the Adeemed@ requests
for admissions attached to Reynolds=s response.

 








Reynolds also complains about the trial court=s granting appellees= objections to his affidavit. 
Appellees objected to nearly every sentence in the affidavit.  But we need not address each objection.  Considering the affidavit in the light most
favorable to Reynolds, as we must, and ignoring all conclusory statements in
the affidavit, which are not proper summary judgment evidence,[11]
we glean the following from his affidavit:

!       Appellees routinely and
repeatedly used the United States mail and interstate telephone lines to
solicit, contact, and deliver information to Reynolds;

!       Reynolds paid appellees
many hundreds of dollars, which appellees collected in payment more than once;

!       Appellees made
representations to and contracted with Reynolds with respect to the newsletter,
and it appears appellees sold the same thing to many others in Texas, the
United States, and outside the United States;








!       Reynolds believed and
trusted appellees and came to believe the Technology Investing
newsletter was reliable and read it regularly. 
He also regularly called the hotline for Murphy=s advice and received and read many of the flash bulletins.  He got a lot of information and advice from
appellees who advertised and promoted Murphy;

!       Appellees represented that
Murphy had special experience, knowledge, skill, and special contacts and had
developed a new, but successful and tested method for selecting the best and
most profitable investments, that he could Asafely lead . . . subscribers down the path to build . . . big profits
over time@;

!       Murphy was represented as
a person who managed successful investment funds for individuals and managed
mutual funds;

!       Appellees tried to tell
the court that a book and articles about Murphy told of some of the more sordid
and revealing true facts about Murphy, but appellees did not previously provide
that book and those articles to Reynolds. 
Reynolds knew nothing of these facts until April 30, 2002;

!       Reynolds initially began
paying for his subscription in November 1999 and renewed his subscription until
around November 2001;

!       Murphy said another
analyst Amight be headed for >hell> because of
[that analyst=s] short
comings as an analyst,@ and Murphy
made frequent references to his Awall of shame@ for
analysts whom he claimed he had outperformed;

 








!       Appellees purported to
sell advice and expertise to Reynolds, and Reynolds paid appellees for that
advice and expertise;

!       Part of the subscription
fee pays for the newsletter.  Reynolds
also received fax updates to the newsletter and access to telephone hotlines;

!       Appellees promoted Murphy
aggressively as a stock guru referring to him as legendary for his alleged
skill in finding and selecting investments;

!       Murphy eventually made
statements on the hotline and in the publication admitting directly or
indirectly that his earlier strategy and recommendations were fundamentally
wrong; and

!       Reynolds would not have
subscribed to the newsletter had he been informed of Murphy=s criminal history, past drug use, and poor performance as a fund
manager.[12]








As explained below, none of this evidence creates a fact issue on any
of appellees= grounds for
summary judgment.  Thus, we overrule
Reynolds=s eighth issue to the extent that the affidavit contains conclusory
statements.  But we need not determine
whether the remainder of the issue should be sustained because even considering
the remaining evidence that the trial court agreed was objectionable, the
affidavit does not create a fact issue on Reynolds=s claims.  Having dispensed with
Reynolds=s issues related to procedural matters, we now turn to his substantive
issues involving the propriety of granting the traditional motion for summary
judgment.

Standard of Review

In a summary judgment case, the issue on appeal is whether the movant
met the summary judgment burden by establishing that no genuine issue of
material fact exists and that the movant is entitled to judgment as a matter of
law.  Tex.
R. Civ. P. 166a(c); Sw. Elec. Power Co. v. Grant, 73 S.W.3d 211,
215 (Tex. 2002); City of Houston v. Clear Creek Basin Auth., 589 S.W.2d
671, 678 (Tex. 1979).  The burden of
proof is on the movant, and all doubts about the existence of a genuine issue
of material fact are resolved against the movant.  Sw. Elec. Power Co., 73 S.W.3d at 215.

When reviewing a summary judgment, we take as true all evidence
favorable to the nonmovant, and we indulge every reasonable inference and
resolve any doubts in the nonmovant's favor. 
Valence Operating Co. v. Dorsett, 164 S.W.3d 656, 661 (Tex. 2005).  Evidence that favors the movant=s position will not be considered unless it is uncontroverted.  Great Am. Reserve Ins. Co. v. San Antonio
Plumbing Supply Co., 391 S.W.2d 41, 47 (Tex. 1965).








The summary judgment will be affirmed only if the record establishes
that the movant has conclusively proved all essential elements of the movant=s cause of action or defense as a matter of law.  Clear Creek Basin, 589 S.W.2d at 678.

If the uncontroverted evidence is from an interested witness, it does
nothing more than raise a fact issue unless it is clear, positive and direct,
otherwise credible and free from contradictions and inconsistencies, and could
have been readily controverted.  Tex. R. Civ. P. 166a(c); Trico
Techs. Corp. v. Montiel, 949 S.W.2d 308, 310 (Tex. 1997).

A defendant who conclusively negates at least one essential element of
a cause of action is entitled to summary judgment on that claim.  IHS Cedars Treatment Ctr. of Desoto, Tex.,
Inc. v. Mason, 143 S.W.3d 794, 798 (Tex. 2004).  Once the defendant produces sufficient
evidence to establish the right to summary judgment, the burden shifts to the
plaintiff to come forward with competent controverting evidence raising a
genuine issue of material fact with regard to the element challenged by the
defendant.  Centeq Realty, Inc. v.
Siegler, 899 S.W.2d 195, 197 (Tex. 1995).

First
Amendment Protection - Negligence and

Negligent
Misrepresentation

 








In his first and second issues, Reynolds contends that a First
Amendment case relied on by appellees, Lowe, does not provide authority
for summary judgment on all of his claims against appellees.  472 U.S. at 181, 105 S. Ct. at 2557.[13]  He contends that Lowe does not address
the specific issues in this case and that it cannot be used to shield a
publisher and author for wrongful speech. 
Thus, we begin with an analysis of the Lowe case.

The issue in Lowe was whether the Securities and Exchange
Commission (SEC) could obtain a permanent injunction under the federal
Investment Advisers Act (IAA) prohibiting the publication of securities
newsletters containing Anonpersonalized
investment advice and commentary.@  Id. at 183, 105 S. Ct.
at 2559.  The Court described the
publications at issue in that case as follows:

A
typical issue of the Lowe Investment and Financial Letter contained general
commentary about the securities and bullion markets, reviews of market indicators
and investment strategies, and specific recommendations for buying, selling, or
holding stocks and bullion.  The
newsletter advertised a Atelephone
hotline@ over
which subscribers could call to get current information.  The number of subscribers to the newsletter
ranged from 3,000 to 19,000.  It was
advertised as a semimonthly publication, but only eight issues were published
in . . . 15 months. . . .

 

. . .
.

 








The
Lowe Stock Advisory had only 278 paid subscribers and had published only four
issues between May 1981 and its last issue in March 1982.  It also analyzed and commented on the
securities and bullion markets, but specialized in lower-priced stocks.  Subscribers were advised that they could
receive periodic letters with updated recommendations about specific securities
and also could make use of the telephone hotline.

 

Id. at 185 & n.7, 105 S.
Ct. at 2560 & n.7.  The Supreme Court
held that the newsletter was a bona fide publication of general
circulation.  Thus, it was not an Ainvestment adviser@ subject to federal regulation under the IAA, and the government could
not impose a prior restraint on its publication.  Id. at 211, 105 S. Ct. at 2573.








We agree that Lowe is not directly on point.  This case does not involve an attempt by a
governmental entity to restrain speech under the IAA.  It concerns a private litigant=s attempt to impose liability on a publisher and author.  In addition, the First Amendment does not
protect fraudulent or deceptive speech, see, e.g., Illinois v. Telemarketing
Assocs., 538 U.S. 600, 612, 123 S. Ct. 1829, 1836 (2003), nor does it give
one the right to breach a contract or make false warranties.  R.A.V. v. City of St. Paul, 505 U.S.
377, 420, 112 S. Ct. 2538, 2563 (1992) (Stevens, J., concurring).  Thus, summary judgment would not have been
proper on First Amendment grounds as to Reynolds=s breach of contract, fraud and misrepresentation, and DTPA
claims.  We have found no Texas authority
construing Lowe, nor have we found any Texas case in which a subscriber
to or reader of a publication sued the publication and its author based on
nondefamatory, negligently untruthful or misleading content contained within
the publication.  But since Lowe
was decided, two cases in other jurisdictions have explored whether publishers[14]
of similar newsletters could be liable to private litigants for negligent
investment Aadvice@ given in a similar format. 
Those cases held that publishers of subscription newsletters similar to
the one at issue here could not be held liable for negligence and negligent
misrepresentation.  See Ginsburg,
915 F. Supp. at 739-40; Daniel v. Dow Jones & Co., 520 N.Y.S.2d 334,
336-40  (N.Y. Civ. Ct. 1987).[15]









The court in Ginsburg granted the motion to dismiss of the
defendants, the author and publisher of an investment newsletter.  915 F. Supp. at 734, 740.  The plaintiff had sued the defendants because
he relied on investment advice contained in the newsletter that turned out to be
based on inaccurate assumptions, which the author later admitted in the
newsletter.  Id. at 734.  In determining that Ginsburg=s claims for negligence and negligent misrepresentation should be
dismissed, the court noted that A[t]he publication is offered to the general public and the information
provided in the publication is of a general nature, that is, it is not
specifically tailored to [the] financial situation of any individual
subscriber.@  Id. at 739.  The court held that the newsletter, which was
similar to the newsletter at issue here, was Asubject to the same protection under the First Amendment as any other
publication.@  Id. 
Based on First Amendment concerns and concerns of unlimited liability
because of the scope of publication of such newsletters,[16]
the court held that Ginsburg=s negligent misrepresentation claims should be dismissed.  Id. at 738-40.








In Daniel, the plaintiff subscribed to an online news service
accessible via access codes and passwords. 
520 N.Y.S.2d at 335.  The
plaintiff claimed that the service negligently published a news story that was
false and misleading because it omitted a material fact.  Id. 
The court granted the defendant=s motion to dismiss the cause of action, holding that the relationship
of the parties was Afunctionally
identical to that of a purchaser of a newspaper@[17] and consequently there was no special relationship between the
parties upon which to impose liability for negligent misrepresentation.[18]  Id. at 336-38.  The court also held that the news service was
entitled to the same First Amendment protection as newspapers, which precludes
liability for nondefamatory, negligently untruthful news.  Id. at 339.








We agree with the analysis and holdings of these cases with respect to
the First Amendment issue.[19]  We conclude that if the summary judgment
evidence shows that appellees authored and published an investment newsletter
of general circulation, similar to those at issue in Lowe and Ginsburg,
then appellees are entitled to First Amendment protection from Reynolds=s negligence and negligent misrepresentation claims.  

Appellees= summary
judgment evidence includes affidavits from Murphy and David Bishop, Senior Vice
President of Phillips.  In his affidavit,
Bishop avers that








6.     Beginning in January 1999 and continuing
each month since then through the present time, the [Technology Investing]
Newsletter was prepared by Murphy and his staff and provided to Phillips which,
in turn, published it and sent copies to Newsletter subscribers every month.

 

7.     Murphy also prepared supplements to the
monthly Newsletter for distribution by Phillips called Flash Bulletins and
hotline updates.

 

8.     The Newsletter is available to the public
and can be obtained for an annual subscription price.

 

. . .
.

 

10.   Subscriptions to the newsletter were
advertised in a free report (the AFree Report@). .
. . The Free Report was advertised in a separate advertisement (the AAdvertisement@). .
. . In 1999, the Advertisement was sent to approximately 1,000,000 people.  The Free Report advertises a subscription to
the Newsletter, which includes receiving the Newsletter and special reports. .
. .

 

. . .
.

 

16.   Reynolds=[s] subscriptions to the
Newsletter, like all other subscriptions to the Newsletter, included receiving
the Newsletter and supplemental information via Flash Bulletins by fax or
e-mail and access to Internet hotline updates by e-mail, fax or a recorded
telephone message.

 

. . .
.

 

19.   Reynolds received and/or had access to the
same Newsletters, Flash Bulletins and hotline updates that were sent or made
available to every subscriber of the Newsletter.

 

. . .
. 

 








29.   Phillips has no knowledge of Reynolds=[s]
individual, personalized financial conditions or any other personal matter of
Reynolds.

 

 

Reynolds avers in his affidavit that the newsletter, as supplemented
with faxed updates and access to a telephone hotline, is

much
different from the investment information in a newspaper or magazine, like the
New York Times, the Fort Worth Star Telegram or U.S. News. . . .  The New York Times and the Fort Worth
Star-Telegram are regular newspapers. 
They can both be bought freely at newsstands in many places, including
street corners, stores and even at airports. 
The Murphy Technology Investing Newsletter cannot be purchased at any of
these types of locations. . . . The only way to get access to the Murphy TI
Newsletter is to buy a subscription. . . . 
The newsletter informs the subscribers that it is not supposed to be
shown to anyone who is not a subscriber. 
It can also be accessed on line; but again it is not supposed to be
shown to anyone who is not a subscriber. 
In order to access it on line one must have an access code.  The code is changed frequently.  The subscription also allows a series of
telephone access hotline updates.  To
access . . . Hotlines for the phone updates, one must first call a phone
number, and then use a special access code. 
Again, the code is changed often. 

 








According to Reynolds=s affidavit, the purpose of the access code is to prevent
nonsubscribers from accessing the hotline. 
Reynolds also avers that the fax updates are limited to subscribers and
are not supposed to be shared with anyone else. 
Reynolds further avers that A[b]y contrast, the newspapers and U.S. News do not offer subscribers
Hotlines or Flash Bulletins.  The
purchased information can be shared freely and without restriction.@  According to his affidavit,
these types of publications are available at public libraries, but Technology
Investing is not. 

 








We hold that the summary judgment evidence established as a matter of
law that Technology Investing, like the newsletters at issue in Lowe
and Ginsburg, Ais offered
to the general public and the information provided in the publication is of a
general nature, that is, it is not specifically tailored to [the] financial
situation of any individual subscriber.@  Ginsburg, 915 F. Supp.
at 739.  That the newsletter was
available only to subscribers, was supplemented by hotline access and AFlash Bulletins,@ and is not
as widely published as many well-known newspapers does not change the general
nature of the publication.  The focus in Lowe
was not the number of subscribers to a particular publication but the
generalized nature of content of the publication.  Lowe, 472 U.S. at 208, 105 S. Ct. at
2572.  Here, there is no evidence that
the pool of potential subscribers was limited only to a certain group or that
any of the advice contained in the newsletter, flash bulletins, or hotline
updates was specifically tailored to the financial condition or other
circumstances of any individual subscriber. 
To the contrary, the issues of the newsletter included in the summary
judgment evidence show that general advice was given.  Accordingly, the trial court did not err by
granting summary judgment on First Amendment grounds on Reynolds=s negligence and negligent misrepresentation claims.[20]  We overrule Reynolds=s first and second issues.

Because summary judgment would not have been proper on First Amendment
grounds as to Reynolds=s breach of
contract, fraud and misrepresentation, and DTPA claims, we must examine the
other summary judgment grounds asserted by appellees with respect to those
claims.

Breach of Contract








Appellees contend that they are entitled to summary judgment as a
matter of law on Reynolds=s breach of
contract claim because the evidence shows that they complied with the only agreement
between the partiesCto supply an
investment newsletter.  Appellees
presented evidence showing that they sent Reynolds issues of the newsletter in
accordance with his subscription. 
Reynolds does not claim that he did not receive the newsletter as
promised.  Instead, he complains about
the quality of the advice in the newsletter. 
He claims that he and appellees agreed that appellees would provide him
with expert advice and they did not.[21]

Specifically, Reynolds contends (1) that Murphy promised his
subscribers that if they followed his advice, they would make money and (2)
that Murphy did not give his best advice; therefore, he failed to meet his
contractual obligations.  Reynolds points
to evidence that

Murphy advised Technology Investing Newsletter subscribers to Ahold@ onto
Microsoft anticipating a growth value;[22]
. . . and, at the same time provided advice to subscribers to a different
service to sell their Microsoft stock anticipating a drop in value. . . .
Reynolds followed the advice to hold Microsoft, having never received Murphy=s advice to sell it. . . . As a result he lost money in that time
period as his shares lost value.

 








Appellees attached to their summary judgment motion a copy of the
initial mailing Reynolds received and a copy of the free report that he ordered
as solicited in the mailing.  A review of
those mailings shows that much of the so-called promises are puffery.[23]  For example, the newsletter states, AAnd for the past years, I=ve made money for other people C people like you. . . .@  It also claims that Murphy=s method is A[t]he safest
possible way to invest in the future,@ and that it Acan help you
invest in the future so that you multiply your wealth up to five times
over the next 10 years.@[24]  None of these statements makes
any specific promises, however.








Towards the end of the free report is a list entitled, ABesides making you rich, what can I do for you?@  Among the items listed are AI will tell you what you=re not being told about what=s really going on in technology stocks,@ AI will give
you the safest way to invest in very
high growth companies,@ and AI will give you the confidence to invest in things you understand.@  Reynolds does not allege that appellees broke
any of these specific promises.  In the
same list is an item stating, ABut I cannot give you overnight fortunes . . . our perspective is long term.@ 

The only specific example of bad advice that Reynolds alleges is the
different advice given about Microsoft stock. 
Attached to his summary judgment response are copies of pages from the
August 2000 Overpriced Stock Service, which states at the beginning, AWARNING!  SUBSTANTIAL SHORT
SELLING IS FOR PROFESSIONALS AND SOPHISTICATED INDIVIDUAL INVESTORS ONLY.  START SMALL! 
DIVERSIFY AND SET FIRM STOP LOSS POINTS. 
PLEASE USE DISCRETION IN DISCUSSING SHORT SALE IDEAS WITH THE PRESS OR
NONSUBSCRIBERS.@  It further notes, ALet us explain exactly why we turned short-term negative on the
technology stocks and recommended several trading shorts on the Hotline.@  It later states that Aalthough we like many of these stocks long term, the money directly
ahead looks to us to be on the short side.@ 








As evidence that different advice was given in the August 2000 issue
of Technology Investing, Reynolds points us to an exhibit attached as
evidence to his motion for continuance. 
But this evidence does not show that the advice in the Overpriced
Stock Service was any better or worse than the advice given in the Technology
Investing newsletter.  In fact, the
advice appears to be almost identical. 
An excerpt from that issue is as follows:

I
want you to sell EMC [a different company=s
stock] . . . I am moving all of our other stocks [including Microsoft] to
a Ahold@
until it looks as though we=re nearing the bottom of the
slump.  I will tell you immediately on
the Hotline . . .  as soon as it=s
safe to resume buying. 
Long-term investors don=t have to sell any other Technology
Investing recommendationsCthey will be higher by year=s end
or early in 2001 as business comes back strongly in the fourth quarter.  Shorter-term investors with taxable gains
also shouldn=t
sell anything else . . . .  

 

However,
shorter-term investors who can offset realized gains and losses, or those who
have tax-free accounts, may want to lock in your gains and take some money off
the table that would be available to reinvest at the lower prices I see
coming.  The most vulnerable of our
stocks probably are . . . MSFT [defined earlier as Microsoft].  If you are going to take some short-term
profits, those would be the stocks to trade on any up days during the slump. 

 








Assuming Murphy is the author of the Overpriced Stock Service,
which we find no evidence of, this evidence does not raise a fact issue on
whether appellees breached any promises to Reynolds.  The two publications appear to have exactly
the same advice with respect to short-selling Microsoft stock.  The information regarding holding Microsoft
stock was contained in the Technology Investing newsletter but not the Overpriced
Stock Service; however, the evidence shows that the Overpriced Stock
Service was geared toward short-selling, and the Technology Investing
newsletter was geared toward long-term gains. 
Because Reynolds did not present evidence raising a fact issue as to
whether appellees breached any agreement with him, we hold that appellees were
entitled to summary judgment on Reynolds=s breach of contract claim.

Fraud and Misrepresentation

Reynolds further contends that he raised a fact issue as to whether
appellees engaged in fraud and misrepresentation by failing to disclose that
Murphy has a prior criminal record and a past history of drug use, thus
misrepresenting Murphy=s
qualifications and experience.  Reynolds
alleges that

on
April 30, 2002, [he] learned for the first time . . . the facts that Murphy had
undergone a mind altering experience after he had taken LSD in the [1960s] and
that, afterward, Murphy had robbed a bank when he fell on hard times and that
Murphy was convicted for that crime of bank robbery in a federal court.

 








Reynolds also alleged that he learned Murphy had robbed more than one
bank and that he had used a pistol in the commission of the offenses.  It was as a result of these discoveries,
Reynolds alleges, that he realized Murphy and Phillips were perpetrating a
scam.  The thrust of Reynolds=s argument is that appellees represented Murphy=s Atalents and
skills in an untrue light@ because
they Aheld Murphy out as an >expert,= a >guru,= yet at the
same time withheld information that might lead people to question his
judgment[:] the fact that he committed armed robbery in his salad days,[25]
used drugs, and managed poorly performing funds.@ 

Appellees attached to their summary judgment motion an affidavit from
Murphy, in which he averred that in 1966 he was convicted of Afederal crimes which could commonly be called bank robbery@ and that APresident
Nixon pardoned [him] of those crimes.@  A copy of the pardon is also
attached to the motion.  He also averred
that he has disclosed these matters in Avarious published articles@ and in one of his books. 
Murphy also avers that in the 1960s he Atwice used morning glory seeds, an LSD analogue, before LSD was made
illegal.@  Appellees do not contend that
Murphy=s past history of drug use and bank robbery was ever disclosed in the
newsletter, but they did attach to their summary judgment motion pages from
Murphy=s book in which he discloses the information.  Murphy=s book was promoted in the Free Report that solicited subscriptions to
the newsletter.








A person commits fraud by (1) making a false, material
misrepresentation (2) that the person either knows to be false or asserts
recklessly without knowledge of its truth (3) with the intent that the
misrepresentation be acted upon, (4) and the person to whom the
misrepresentation is made acts in reliance upon it (5) and is injured as a
result.  Formosa Plastics Corp. USA v.
Presidio Eng'rs & Contractors, Inc., 960 S.W.2d 41, 47‑48 (Tex.
1998) (op. on reh=g); Miller
v. Kennedy & Minshew, Prof=l Corp., 142 S.W.3d 325, 345 (Tex.
App.CFort Worth 2003, pet. denied). 
A misrepresentation may consist of the concealment or nondisclosure of a
material fact when there is a duty to disclose. 
Custom Leasing, Inc. v. Tex. Bank & Trust Co., 516 S.W.2d
138, 142 (Tex. 1974); Miller, 142 S.W.3d at 345.  The duty to disclose arises when one party
knows that the other party is ignorant of the true facts and does not have an
equal opportunity to discover the truth. 
Miller, 142 S.W.3d at 345. 
Whether a duty to disclose exists is a question of law.  Bradford v. Vento, 48 S.W.3d 749, 755
(Tex. 2001).[26]  








Here, appellees contend that they had no duty to disclose details
about Murphy=s past
criminal history to Reynolds because they did not know Reynolds was unaware of
those details and because they did not intend for Reynolds or any other
subscriber to rely on the absence of such details in subscribing to the
newsletter.  In addition, they argue that
because they never made any representation to Reynolds about Murphy=s personal history, there was no partial, misleading impression that
required further disclosures.

Both Murphy and Bishop[27]
averred in their affidavits that they did not intend for any person Ato subscribe or not subscribe to the [n]ewsletter based on knowing or
not knowing about [Murphy=s] federal
crimes and drug use in the 1960[]s.@  Murphy further avers that he
has publicly disclosed his past history of armed bank robbery and drug use in Avarious published articles@ and in an investing book he wrote.[28]

According
to Bishop=s
affidavit, A[t]he
approximate initial circulation of the [n]ewsletter as of January 1999 was to
1,400 subscribers and it was circulated to between 1,400 and 103,000
subscribers each month from that time to the present [April 2003].@  Both Murphy and Bishop averred that they had
no knowledge of AReynolds=
individual, personalized financial conditions or any other personal matter of
Reynolds.@ 

 

 








In his summary judgment affidavit, Reynolds averred as follows:

Now
the [appellees] are trying to tell this court that a book and articles told of
some of the more sordid and revealing true facts about Murphy; in this attempt
the [appellees] are being deceptive and disingenuous, for they never made any
of this available to me.  I knew nothing
of it until I happened on my own to learn some of it in late April, 2002, to my
shock and dismay.

 

. . .
The [appellees] failed to disclose significant and relevant information about
Murphy, and even his true first name,[29]
making it much more difficult for their intended victims, including me, to
learn anything about the awful truth of what these [appellees] were really up
to, and really doing. . . .

 

. . .
Notwithstanding my own diligence, I did not discover the awful truth of what
was going on, and learn of the false, misleading, deceptive and fraudulent acts
and practices of the [appellees] until on or about April 30, 2002.

 








The evidence shows that although Phillips and Murphy did not include
the information in the newsletter, as a disclaimer or otherwise, they did not
attempt to conceal the information either. 
Murphy discussed it candidly in his book and advertised that book to
potential subscribers.  And despite
Reynolds=s conclusory statements that appellees intentionally made it difficult
for subscribers and potential subscribers to discover the information, he
failed to bring forward any specific evidence regarding his attempts to
investigate Murphy and his past history. 
To the contrary, Reynolds clearly states in his affidavit that he was
able to discover this information on his own. 
We hold that Reynolds did not bring forward any evidence raising a fact
issue as to whether appellees were actually aware that he did not know about
Murphy=s past history or that he did not have an opportunity to discover
it.  See Bradford, 48 S.W.3d at
754-56 (holding that when jury charged as to fraud by concealment or partial
disclosureCwithout
affirmatively adopting theory as valid cause of actionCthat plaintiffs= fraud claim
failed because they did not bring forward any evidence that defendant
knew Bradford was unaware of information that was not disclosed or that he did
not have an equal opportunity to discover it).[30]








Reynolds further alleged that appellees misrepresented Murphy=s talents and skills by failing to disclose his past performance as a
fund manager, which Reynolds claims was poor. 
But appellees did not move for summary judgment as to this allegation.  A trial court cannot grant summary judgment
except on the grounds expressly presented in the motion.  Johnson, 73 S.W.3d at 204; Sci.
Spectrum, Inc., 941 S.W.2d at 912. 
Thus, a traditional summary judgment would not have been proper as to
this part of Reynolds=s fraud and
misrepresentation claim.  Moreover,
appellees= no-evidence
summary judgment was also premised only on Athe nondisclosure of Murphy=s personal history.@  Thus, a no-evidence summary
judgment would not have been proper either. 
Hinkle v. Adams, 74 S.W.3d 189, 193 (Tex. App.CTexarkana 2002, no pet.).

Accordingly, we hold that the trial court did not err by granting
summary judgment for appellees on Reynolds=s fraud and misrepresentation claims with respect to the nondisclosure
of Murphy=s past drug
use and criminal history.  But we further
hold that because appellees did not move for summary judgment as to whether
appellees misrepresented Murphy=s Atalents and
skills@ by failing to disclose his past performance as a fund manager, they
were not entitled to either a traditional or no-evidence summary judgment on
that particular claim.

Violation of DTPA

Appellees moved for summary judgment on five grounds as to Reynolds=s DTPA claims.  We turn first to
appellees= contention
that no statements of appellees support a DTPA claim because it is
dispositive.  See Tex. R. App. P. 47.1.  In his second amended petition, Reynolds
claimed that appellees made the following misrepresentations:








!       Murphy had special skill
and expertise in the field of investing and more especially technology
investments;

!              Murphy was an expert in technology investing with great experience and
expertise;

!       Murphy created an
investment methodology based on highly reliable principles and that those who
invested in accordance with his philosophy would realize great returns on
investments.  The growth flow method
developed by Murphy was proven;

!       Murphy is an investment
adviser with twenty years of experience who carefully and personally researched
companies before he gave advice;

!       Murphy would safely guide
investors so they could invest and make profits safely, and he had special
knowledge and expertise that enabled him to do this;

!       Murphy was a person who
ran investment funds and even managed private investment portfolios; and 

!       Murphy gave constant,
strong, equivocal assurances that the market would rebound and go even higher
than ever and investors should maintain and not sell his recommended core
holdings.

 








Reynolds also claims that appellees violated the DTPA by failing to
disclose Murphy=s two
episodes of drug use and his past criminal history.  

To prove his DTPA claims, Reynolds must show that appellees engaged in
a false, misleading, or deceptive act or practice enumerated under section
17.46(b) of the DTPA.  Tex. Bus. & Com. Code Ann. ' 17.46(b); Doe v. Boys Clubs of Greater Dallas, Inc., 907
S.W.2d 472, 478 (Tex. 1995); Chandler v. Gene Messer Ford, Inc., 81
S.W.3d 493, 501 (Tex. App.CEastland 2002, pet. denied). 
Reynolds alleges specifically that these alleged misrepresentations
violate the following subsections of 17.46(b):

(b)  Except as provided in Subsection (d) of this
section, the term Afalse,
misleading, or deceptive acts or practices@ includes, but is not limited
to, the following acts:

 

. . .
. 

 

(5)  representing that goods or services have
sponsorship, approval, characteristics, ingredients, uses, benefits, or
quantities which they do not have or that a person has a sponsorship, approval,
status, affiliation, or connection which he does not;

 

. . .
.

 

(7)  representing that goods or services are of a
particular standard, quality, or grade, or that goods are of a particular style
or model, if they are of another; 

 

(8)  disparaging the goods, services, or business
of another by false or misleading representation of facts;








. . .
.

 

(12)  representing that an agreement confers or
involves rights, remedies, or obligations which it does not have or involve, or
which are prohibited by law;

 

. . .
.

 

(24)  failing to disclose information concerning
goods or services which was known at the time of the transaction if such
failure to disclose such information was intended to induce the consumer into a
transaction into which the consumer would not have entered had the information
been disclosed.

 

Tex. Bus. & Com. Code Ann. '
17.46(b)(5), (7), (8), (12), (24).

Reynolds=s claims
under section 17.46(b)(5), (7), and (12) relate to his claims that appellees
misrepresented Murphy=s skill and
expertise as a stock analyst.  Appellees
attached as summary judgment evidence excerpts from third party books and
articles including Murphy in a list of experts, describing him as Athe man many regard as America=s top technology guru,@ and a Anear-legend
in . . . Silicon Valley for his stock-picking prowess.@  One article says Murphy=s model portfolio ranked fifth best among 77 newsletters tracked by
Hulbert Financial Digest.  See supra
page 32, n. 21.  Appellees= summary judgment evidence also references the fact that Murphy has
been involved in stock analysis in some form or fashion since the late
1960s.  

 








We have discussed previously most of the evidence Reynolds points to
as raising a fact issue on his claims, specifically the advice given in the Overpriced
Stock Service about Microsoft and Murphy=s past history.  Reynolds also
attached to his summary judgment other evidence that he claims shows Murphy is
in fact a failure at analyzing and picking tech stocks, even though he claims
he is a success.  This evidence consists
of a copy of an article purporting to be from TheStreet.com dated February 20,
2002.[31]  Part of this article is entitled AThe Definition of Chutzpah@:

There=s a
fellow named Michael Murphy who, despite a truly dismal record as a fund
manager, keeps spamming investors about his latest picks.

 

Murphy=s
emails, replete with grammatical and spelling errors, urge recipients to sign
up for a free trial of his Technology Investing newsletter.  I=ll refrain from linking to
Murphy=s
site, where you=ll
find a biography touting him as AAmerica=s
premier technology stock analyst@ and former head of an
unnamed software company.  He=s the
author of Every Investor=s
Guide to High Tech Stocks and Mutual Funds and pens two other newsletters, The
California Technology Stock Letter and Biotech Investing.  Murphy hadn=t
returned a call seeking comment as of Wednesday afternoon.

 








On
his site, Murphy, a Harvard grad who=s no stranger to the
investment conference circuit, touts a 66.4% cumulative return since starting
his newsletter in late 1998, though no specific dates are provided on his bio
page.  That looks good vs. the Nasdaq
Composite, but it doesn=t
really match up with the returns of his two tech funds, two of the wormiest
apples in that ravaged bin.

 

The
Monterey Murphy New World Technology fund, which he=s run
since its 1993 launch, averages a stunning 20% annual loss over the past five
years, compared with a 6% annual gain for its average peer.  That=s dead last among all tech
funds, according to Chicago research house Morningstar.

 

The
Monterey Murphy New World Core Technology fund, which lives in the convertible
bond fund category, has amassed an equally stunning record.  Murphy started running the fund in 1996, and
it averages an annual 7.5% loss over the past five years.

 

Adding
insult to injury, both funds carry a 1.99% annual expense ratio, well above
their average peer=s
1.73%.  A subscription to this guru=s
newsletter costs $195 per year, though it=s only $375 for two years.

 

What
a bargain. 

 

But appellees= summary
judgment evidence contains a copy of the March 2000 issue of Technology
Investing, in which Murphy states, 

The
mutual funds I manage are aggressive, and I raised about 50% cash at the end of
1999.  (I didn=t
advise you to do this since we have a more conservative, long-term approach in Technology
Investing.) But I=ve
now put most of that money back to work as individual stocks came down, and I
want you to do the same.

 








The issues of Technology Investing relied on by both appellees
and Reynolds consistently emphasize the long-term investment approach described
in that publication as opposed to more aggressive or short-term methods
advocated by Murphy in different contexts, including, apparently, the
investment funds he manages.  We hold
that Reynolds did not raise a fact issue as to his claims under section
17.46(b)(5) and (12).








Although the poor performance records of Murphy=s investment funds cited in the article are over a relatively
long-term period, we do not believe this raises a fact issue under section
17.46(b)(7) because the newsletter clearly indicates that the investment funds
Murphy managed were separate from and more aggressive than the investments
recommended in Technology Investing and involved a different
strategy.  But even if this evidence
raises a fact issue as to whether Murphy misrepresented his experience and
expertise in picking investments, it does not raise a fact issue as to
appellees= liability
under section 17.46(b)(7).  Appellees
also moved for summary judgment on Reynolds=s DTPA claims on the ground that Reynolds could not prove causation
because he admits he did not follow Murphy=s advice to Ahold@ the recommended stocks long-term; thus, Reynolds=s losses were caused by his decision to sell his stocks against Murphy=s advice rather than any representations about Murphy=s stock-picking prowess.  See
Tex. Bus. & Com. Code Ann. ' 17.50(a) (Vernon 2002) (DTPA cause of action may be maintained when
deceptive act a Aproducing
cause@ of economic or mental anguish damages); Brown v. Bank of
Galveston, Nat=l Assoc., 963 S.W.2d 511, 514 (Tex. 1998) (AProducing cause requires that the acts be both a cause‑in‑fact
and a >substantial factor= in causing the injuries.@).  We agree and hold that
Reynolds failed to raise a fact issue under section 17.46(b)(7). 

We further hold that Reynolds did not raise a fact issue on his claim
under section 17.46(b)(8).  That section
applies only to misrepresentations of fact, not opinion.  See Tweedell v. Hochheim Prairie Farm Mut.
Ins. Ass=n, 1 S.W.3d 304, 309 n.10 (Tex. App.CCorpus Christi 1999, no pet.). 
The statements Reynolds attributes to Murphy regarding other analystsCthat one analyst was headed for hell because of his stock picks and
that he had a Awall of
shame@ for analysts he claimed were poor performersCare statements of opinion, not fact. 
Thus, Reynolds=s summary
judgment evidence does not raise a fact issue on his section 17.46(b)(8) claim.









Appellees also moved for summary judgment on Reynolds=s 17.46(b)(24) claim:  that
appellees failed to disclose Murphy=s past history for the purpose of inducing him into subscribing to the
newsletter.  Appellees provided Murphy=s and Bishop=s affidavits
in which they averred that they never intended any person to rely on the
absence of information about Murphy=s past history in deciding whether or not to subscribe to the
newsletter.  And although Reynolds
brought forward evidence that he would not have subscribed to the newsletter
had he known of Murphy=s past
history, he did not bring forward any evidence raising a fact issue as to
appellees= intent in
failing to disclose this information in the newsletter, as opposed to the other
media in which it had already been disclosed. 
See Head v. U.S. Inspect DFW, Inc., 159 S.W.3d 731, 744 (Tex.
App.CFort Worth 2005, no pet.). 
Thus, we hold that appellees were entitled to summary judgment on
Reynolds=s 17.46(b)(24) claim.

Accordingly, we overrule Reynolds=s sixth issue as to his fraud and misrepresentation claims based on
nondisclosure and his negligence, negligent misrepresentation, breach of
contract, and DTPA claims.  We sustain
his sixth issue as to his fraud and misrepresentation claims based on the
allegation that appellees represented Murphy=s talents and skills in an untrue light by failing to disclose his
past performance as a fund manager.

Conclusion








Having determined that appellees were entitled to summary judgment on
all of Reynolds=s claims
except his claim that appellees engaged in fraud and misrepresentation by
failing to disclose Murphy=s past performance as a fund manager, we affirm the trial court=s judgment except as to that claim. 
We reverse and remand the claim that appellees engaged in fraud and
misrepresentation by failing to disclose Murphy=s past performance as a fund manager for further proceedings
consistent with this opinion. 

 

 

TERRIE
LIVINGSTON

JUSTICE

 

PANEL B:   LIVINGSTON, GARDNER, and MCCOY, JJ.

MCCOY, J. filed a concurring opinion

DELIVERED: February 9, 2006











 
 
 
 
 
 
 
 
 
 
 
 
 
  
 




 

 

 

 

                                      COURT
OF APPEALS

                                       SECOND
DISTRICT OF TEXAS

                                                   FORT
WORTH

 

                                        NO.  2-03-294-CV

 

ERNEST REYNOLDS, III                                                         APPELLANT

 

                                                   V.

 

MICHAEL MURPHY A/K/A AND F/K/A JOHN                              APPELLEES

MICHAEL
MURPHY AND PHILLIPS 

INVESTMENT
RESOURCES, L.L.C.

 

                                              ------------

 

            FROM
THE 17TH DISTRICT COURT OF TARRANT COUNTY

 

                                              ------------

 

                     CONCURRING
OPINION ON REHEARING

 

                                              ------------








I concur in the result
reached by the majority but not in every holding.  The majority holds that A[w]e agree with the analysis and holdings in these cases,@ referring in part to Daniel v. Dow Jones & Co., 520
N.Y.S.2d 334, 336-40 (N.Y. Civ. Ct. 1987), and specifically that Athe relationship of the parties was >functionally identical to that of a purchaser of a newspaper= and consequently there was no special relationship between the
parties.@  See Maj. Op. at 21, 22
(footnote omitted) (emphasis supplied). 
Newspapers are available gratis many places, such as the public
library, business lobbies, etc.  However,
the investment service in this case, as pointed out by Reynolds, is only
available to the reader by subscription and is not supposed to be shown to
anyone other than the subscriber according to the newsletter.  Additionally, the investment service in this
case includes faxed updates and a telephone hotline, requires a
frequently-changed on-line access code, and has a telephone access code to
the  hotline.  I cannot agree these are functional
equivalents.  

I also cannot subscribe to
the argument that there was no duty to provide Reynolds with information about
the background of Murphy because appellees Adid not know Reynolds was unaware of those details and because they
did not intend for Reynolds or other subscribers to rely on the absence of such
details in subscribing to the newsletter.@  See Maj. Op. at
34-35.  Such an argument could be made in
virtually every misrepresentation case and would require Reynolds to prove that
appellees knew that he did not know.  The
method of this proof, would, I am sure, be as interesting as trying to
understand what is meant by the assertion that appellees did not intend for
Reynolds to rely on an absence of information. 
For these reasons, I concur with the overall result of the majority but
not with the aforementioned.

 

BOB MCCOY

JUSTICE

 








DELIVERED:
February 9, 2006











[1]We
also grant appellant=s
agreed motion to extend the length of the motion for rehearing and rehearing en
banc.  In addition to these motions,
appellant filed a motion to supplement the record, attempting to supplement the
clerk=s
record with letters showing that he did request a hearing on his motion to
compel and on appellees=
motion for protective order.  We have
considerable discretion in determining whether to file this record.  See, e.g., Worthy v. Collagen Corp.,
967 S.W.2d 360, 365-66 (Tex.), cert. denied, 524 U.S. 954 (1998).  Not all of the documents that appellant asked
the trial court clerk to file are in the clerk=s
record, and the letters that are in the recordCwhich
discuss setting a hearing on appellant=s motion to compel and
appellees=
motion for protective orderCdo not change our ultimate
conclusion in this opinion:  that the
admissions were never deemed in the first place.  See discussion infra pp.
8-12.  Thus, we deny appellant=s
motion to supplement the clerk=s record.  We also deny appellant=s
request for oral argument.  See Tex. R. App. P. 39.8, 49.3.





[2]472
U.S. 181, 105 S. Ct. 2557 (1985).





[3]Appellees
contend Reynolds waived his challenge to the summary judgment because he failed
to address each ground appellees asserted in their motion.  But Reynolds has presented a general issue on
appeal with respect to the propriety of the summary judgment; thus, he has not
waived his challenge to the propriety of the summary judgment in appellees=
favor.  See Tex. R. App. P. 38.9; Malooly Bros., Inc. v. Napier, 461 S.W.2d 119, 121 (Tex. 1970); see
also Plexchem Int=l, Inc. v. Harris Appraisal Dist., 922 S.W.2d 930, 930 (Tex. 1996).





[4]Reynolds
does not specify any particular advice that he followed or stocks he purchased
or sold in reliance on the advice in the newsletter, other than to allege that
instead of selling Microsoft stock when its price fell, he Aheld@ it
in accordance with Murphy=s
advice.  But Reynolds does admit that he
eventually sold his Microsoft stock at a loss against Murphy=s
advice.





[5]Although
this appears to be an admission that the cause of Reynolds=s
losses was his own failure to follow the advice in the newsletter, it is not
dispositive of all of Reynolds=s claims because appellees
did not allege this admission as a ground for summary judgment on all of
Reynolds=s
claims.  See Johnson v. Brewer &
Pritchard, P.C., 73 S.W.3d 193, 204 (Tex. 2002); Sci. Spectrum, Inc. v.
Martinez, 941 S.W.2d 910, 912 (Tex. 1997).





[6]See Tex. Bus. & Com. Code Ann. '
17.46(b)(5), (7), (8), (12), (24) (Vernon Supp. 2004-05).





[7]Although
we do not condone gamesmanship in the discovery process, we do not address
those issues in this case because other issues are dispositive.





[8]Although
two of Reynolds=s
complaints on appeal are that (1) the trial court improperly granted summary
judgment before the deadline for completing discovery in the case and (2) the
trial court abused its discretion by denying his first motion for continuance
based on the same grounds, both of these complaints pertain to the propriety of
the no-evidence motion for summary judgment only.  Because our disposition of the appeal relates
only to Reynolds=s
complaints about the traditional summary judgment motion, we need not address
his contentions about these two complaints.

 

However, in light of Reynolds=s motion for rehearing, we
note the following:  (1) a traditional
summary judgment is not subject to the same restrictions as a no-evidence
summary judgment, which may not be granted until an adequate time for discovery
has passed, see Tex. R. Civ. P.
166a(a) (AA
party . . . may, at any time after the adverse party has appeared or answered,
move . . . for a summary judgment . . . .@), 166a(i); Clemons v.
Citizens Med. Ctr., 54 S.W.3d 463, 466 (Tex. App.CCorpus
Christi 2001, no pet.).  But cf.
Nelson v. PNC Mortgage Corp., 139 S.W.3d 442, 446 (Tex. App.CDallas
2004, no pet.) (holding, in extreme, fact-specific case, that traditional
summary judgment was improper when discovery motions were outstanding when
trial court ignored all motions filed by pro se inmate, yet promptly set and
responded to all motions filed by civil defendants); and (2) the supreme court
has recently reiterated that a first continuance is not mandatory simply
because it is uncontroverted and in proper form.  See Schneider Nat=l  Carriers, Inc. v. Bates, 147
S.W.3d 264, 292 n.142 (Tex. 2004).  





[9]A
movant=s
exceptions to a nonmovant=s
response or reply complain that the issues identified in the nonmovant=s
response as defeating summary judgment are unclear or ambiguous.  See McConnell, 858 S.W.2d at 343; Shelton
v. Sargent, 144 S.W.3d 113, 119 (Tex. App.CFort
Worth 2004, pets. denied).





[10]Reynolds
served the same set of 498 requests on each appellee for a total of 996
requests.  He had already served a first
set on Murphy containing 15 requests and a first set on Phillips containing 94
requests, a total of 109 first requests. 
He then served a second set containing 207 requests on each appellee,
for a total of 414 requests in the second set. 
In all, Reynolds served 1,519 requests for admissions on appellee.





[11]See
Seaway Prods. Pipeline Co. v. Hanley, 153 S.W.3d 643, 653-54
(Tex. App.CFort
Worth 2004, no pet.).





[12]Other
evidence appellees objected to but that we consider in our holding is detailed
later in this opinion.





[13]Reynolds
contends that a summary judgment based on this ground would be improper because
it was raised for the first time on appeal. 
But appellees raised this as a general ground as to all of Reynolds=s
claims in their motion for summary judgment.





[14]The Ginsburg
case also addressed the potential liability of the author of such a newsletter,
holding that the author could not be held liable for negligence and negligent
misrepresentation on First Amendment grounds. 
Ginsburg v. Agora, Inc., 915 F. Supp. 733, 733-40 (D. Md. 1995).





[15]But
see In re Factor VIII or IX Concentrate Blood Prods. Litig., 25
F. Supp. 2d 837, 845 & n.10, 845-46 (noting that Ginsburg and Daniel
Aindicate
a way of balancing First Amendment values with the value of providing financial
redress for financial losses,@ but distinguishing those
cases in determining that First Amendment did not shield defendant in that case
because need for financial redress for Agrave@
nature of injuries allegedCexposure to and infection
with HIVCoutweighed
potential chilling effect on dissemination of information (emphasis added)). 





[16]The
court relied on the holding in the Daniel case as well as Gutter v.
Dow Jones, Inc., 490 N.E.2d 898 (1986).





[17]The
court stated, ANews
services, whether free to the public, as are television or radio, or more
expensive specialized media, such as defendant=s computerized
database, are instruments for the free flow of all forms of information, and
should be treated as unquestionably within the First Amendment=s
guarantee of freedom of the press,@ and A[T]he
cost of the service and the degree of its distribution are not related to the
importance of the protection needed for the statement at issue.@  Id. at 339-40.  Thus, the focus of the First Amendment inquiry
should be on the specificity of the advice to any given subscriber as opposed
to the free cost or availability of the publication.  The factors cited by the concurring opinion
reflect the publisher=s
greater interest in maintaining a value in, and the proprietary nature of, the
information contained in the newsletter rather than providing specifically
tailored advice to a particular subscriber. 
See Concurring Op. on Reh=g at 1-2.





[18]The
court held that the plaintiff and defendant did not have the type of special
relationship contemplated by section 552 of the Restatement (Second) of
Torts.  We do not address the
applicability of section 552 in this case because appellees did not move for
summary judgment on that ground; their motion for summary judgment alleged only
the First Amendment grounds.  Thus, we
also need not address the section 552 arguments in Reynolds=s
motion for rehearing.





[19]Reynolds
contends that the newsletter contains commercial speech, which does not enjoy
the same level of First Amendment protection as noncommercial speech.  See, e.g., Dun & Bradstreet v. Greenmoss
Builders, Inc., 472 U.S. 749, 759, 105 S. Ct. 2939, 2945 (1985); Ohralik
v. Ohio State Bar Ass=n, 436
U.S. 447, 456, 98 S. Ct. 1912, 1918 (1978). 
He claims that whether the newsletter meets the Lowe definition of
a publication of general circulation is irrelevant because the holding in Lowe
is based solely on the Court=s construction of the IAA,
rather than First Amendment grounds.  But
although the Supreme Court in Lowe did not Aspecifically
address the constitutional question,@ it did conclude as
follows:  ATo
the extent that the chart service contains factual information about past
transactions and market trends, and the newsletters contain commentary on
general market conditions, there can be no doubt about the protected
character of the communications . . . .@  Lowe, 472 U.S. at 210, 105 S. Ct. at
2573 (footnote omitted) (emphasis added). 
This statement is followed by a footnote, which states, AMoreover,
because we have squarely held that the expression of opinion about a commercial
product such as a loudspeaker is protected by the First Amendment, it is
difficult to see why the expression of an opinion about a marketable security
should not also be protected.@  Id. at 210 n.58, 105 S. Ct. at 2573
n.58 (citations omitted).  Thus, we
believe that our conclusion is not precluded by the Court=s
holding in Lowe.  See Commodity
Trend Serv., Inc. v. Commodity Futures Trading Comm=n, 149
F.3d 679, 686 (7th Cir. 1998) (holding that publication containing impersonal
advice and information about the performance or value of particular commodities
does not constitute commercial speech).  






[20]Accordingly,
summary judgment was also proper on Reynolds=s negligence per se
claim.  See Zavala v. Trujillo,
883 S.W.2d 242, 246 (Tex. App.CEl Paso 1994, writ denied)
(holding that Anegligence
per se is not a cause of action separate and independent from a common law
negligence cause of action.  Negligence
per se is merely one method of proving, through proof of an unexcused
violation of a penal statute designed to protect the class of persons to which
the injured party belongs, the breach of duty required in any negligence cause
of action, establishing negligence as a matter of law@
(citation and footnote omitted)).





[21]Some
of the newsletters appellees presented as summary judgment evidence contain a
one-sentence disclaimer in small type, which states, AMichael
Murphy=s
Technology Investing bases its recommendations and forecasts on analytical
techniques and sources found to be reliable in the past, but future accuracy
and profitable results cannot be guaranteed.@  The disclaimer is located at the bottom of
the page in the middle of other information about the newsletter, such as the
date of the copyright and instructions for making address changes.  The disclaimer is not bolded, italicized, or
in any other way set apart from the other information, nor is it included in
the body of the newsletter. 





[22]Reynolds
does not specify whether he bought Microsoft stock initially in reliance on the
advice in Technology Investing, only that he did not sell it when the
price dropped in reliance on Murphy=s advice.





[23]APuffery@ is
an expression of opinion by a seller not made as a representation of fact.  Dowling v. NADW Mktg., Inc., 631
S.W.2d 726, 729 (Tex. 1982).





[24]Other
examples from the free report are, AIf you are on the right side
of this revolution your investments will ride high indeed over the next several
months,@ AYou
don=t
need to guess how to make a fortune from the new >invisible
computer=
revolution . . . because I will tell you exactly how to do it,@ and AI
would like the opportunity to guide you through this wonderful feast, and give
you a way to savor . . . the riches of the future, today.@ 





[25]Defined
by Webster=s
Dictionary as Adays
of youthful inexperience or indiscretion.@  Webster=s Third New International Dictionary 2002
(3d ed. 2002).





[26]In Bradford,
the supreme court expressly stated that it has not adopted section 551 of the
Restatement (Second) of Torts, which recognizes a general duty to disclose
facts in a commercial setting when one party does not make an affirmative
misrepresentation, but its partial disclosures are misleading in light of what
facts it does not disclose.  Id.
at 756. 





[27]Bishop
is the Senior Vice President of Phillips.





[28]This
book is advertised in the Free Report initially sent to potential subscribers,
mentioned above.





[29]According
to evidence in the summary judgment record, Murphy=s
full name under which he was convicted and pardoned is John Michael
Murphy.  The book in which Murphy
discusses his past history lists his name as Michael Murphy. 





[30]Moreover,
we note that the alleged partial representations about which Reynolds complainsCthat
Murphy was an expert stock analystCall relate to Murphy=s
present skills, not his character or his past. 
Reynolds points to no evidence that Murphy or Phillips painted a false
picture of Murphy as having a good moral character either in the past or in the
future.  





[31]Reynolds
does not reference this evidence in his briefs; however, we will nevertheless
discuss it as part of our review of the summary judgment evidence.