**Jerome Z. GINSBURG, Plaintiff,**

v.

**AGORA, INC., et al., Defendants.**

**Civil Action No. WMN 95–125.**

United States District Court,
D. Maryland.

Nov. 14, 1995.

Shawn A. Matlock, Law Office of Baltimore City, for Plaintiff.

Michael E. Geltner, Geltner and Associates, Washington, DC, for Defendants.

## MEMORANDUM

NICKERSON, District Judge.

Before the Court is Defendants' Motion to Dismiss. Paper No. 7. Plaintiff has opposed the motion, and Defendants have replied. Upon a review of the motion and the applicable case law, the Court determines that no hearing is necessary (Local Rule 105.6) and that Defendants' motion will be granted and the case dismissed.

## I. BACKGROUND

This action involves issues of liability for alleged false and misleading statements contained in an investment newsletter entitled "John Pugsley's Journal" ["the Journal"]. Defendant John Pugsley is the author of the Journal; Defendant Phoenix Communications ["Phoenix"] is the owner of the Journal; and Defendant Agora, Inc. ["Agora"] marketed the Journal during the relevant time period. In the Journal's May 1993 issue, Pugsley recommended investing in what Pugsley referred to as the "NOB Spread." *See* Complaint, Exhibit A at 5.[1] In that issue, Pugsley explained the basis for his recommendation, his market assumptions, and discussed in some detail the strategy to be employed in making that investment. *Id.* Plaintiff Jerome Ginsberg followed Pugsley's advice and began investing in the NOB Spread.

Unfortunately for Ginsberg, the assumptions upon which Pugsley based his advice were inaccurate. In the August 1993 issue of the Journal, Pugsley admitted that he was wrong in his assumptions and confessed, "[I]t is a painful experience [to] have underestimated the risk, but more painful to you if you suffered a loss." Complaint, Exhibit B at 5. Plaintiff alleges his loss amounted to over $128,000.

Plaintiff filed the instant Complaint alleging the following causes of action: Count I—Violations of the Maryland Securities Act ["MSA"]; Count II—Violations of the Securities Act of 1933 ["1933 Act"]; Count III—

---

1. The NOB Spread was described as "the spread between the price of the 10–year T-note futures contract and the 10–year T-bond futures contract." *Id.*

Negligence; Count IV—Negligent Misrepresentation; Count V—Breach of Fiduciary Duty; Count VI—Breach of Implied Contract; and Count VII—Violation of Commodity Exchange Act ["CEA"]. Defendants now move to dismiss the entire Complaint.

## II. MOTION TO REMAND

In his Opposition to Defendants' Motion to Dismiss, Plaintiff begins by urging the Court not to rule on Defendants' Motion as "the matter is not properly before the Court." Opposition at 1. This action was originally filed in the Circuit Court for Baltimore City. Defendants removed the action to this Court on January 16, 1995. Although Plaintiff has never filed a motion to remand this action to state court, Plaintiff now argues that, in light of the 1933 Act's anti-removal provision, 15 U.S.C. § 77v, removal was improper.

Section 77v(a) states, in pertinent part, that "no case arising under this subchapter and brought in any State Court of competent jurisdiction shall be removed to any court of the United States." While the plain language of this provision would appear to favor Plaintiff's position, courts have questioned whether plaintiffs should be able to create an absolute bar to removal merely by including a claim under the 1933 Act in their complaint, regardless of the merits of the 1933 Act claim.

In *Bennett v. Bally Mfg. Corp.*, 785 F.Supp. 559 (D.S.C.1992), the plaintiff brought an action in state court alleging violations of § 12(2), 15 U.S.C. 77*l*, relating to a "secondary market transaction." After defendants removed the action to federal court, the plaintiff sought a remand under § 77v.

After ruling that, "defendants may defeat the motion for remand if they can show that the § 12(2) claim is unsupported by the clear weight of legal authority," *Id.* at 561, the court proceeded to analyze whether § 12(2) is applicable to the type of transaction alleged in the complaint. Because the court concluded that case law clearly established that § 12(2) does not apply to secondary market transactions, the court held that the defendants were justified in discounting the 1933 Act's non-removal clause and denied the plaintiff's motion to remand. *Id.* at 562.

Defendants in the instant action argue that the 1933 Act is equally inapplicable to Plaintiff's allegations. Because the Court agrees that the 1933 Act clearly does not apply to the activities of the Defendants, as explained below, the Court will not remand this action.[2]

## III. MOTION TO DISMISS

### A. Legal Standard

A motion made pursuant to Fed. R.Civ.P. 12(b)(6) allows a claim to be dismissed for failure to state a claim upon which relief can be granted. The purpose of a motion under Rule 12(b)(6) is to test the legal sufficiency of the statement of the claim. *Chertkof v. Baltimore*, 497 F.Supp. 1252, 1258 (D.Md.1980). The standard for a motion to dismiss is well known: a complaint should not be dismissed unless it appears beyond doubt that the plaintiff can prove no set of facts that would entitle him to relief. *Conley v. Gibson*, 355 U.S. 41, 45–46, 78 S.Ct. 99, 101–102, 2 L.Ed.2d 80 (1957); *Faulkner Advertising Assoc. v. Nissan Motor Corp.*,

---

**2.** As noted above, Plaintiff has never actually moved to remand this action. The first time that Plaintiff raised the anti-removal statute was in his Opposition to the Motion to Dismiss, filed March 3, 1995. Thus, as an alternative basis for denying Plaintiff's "Motion to Remand," Defendants argue that Plaintiff has waived any right he may have had to remand this action.

Under 28 U.S.C. § 1447(c), "[a] motion to remand a case on the basis of any defect in removal procedure must be made within 30 days after filing of the notice of removal." Defendants contend that any violation of the anti-removal statute is a procedural defect that is waived if not raised within the 30 day period. Although there is some question whether a violation of an anti-

removal statute constitutes a waivable procedural defect or a non-waivable lack of subject matter jurisdiction, see *Williams v. AC Spark Plugs*, 985 F.2d 783, 787 n. 6 (5th Cir.1993) (noting split in authority), this Court is convinced that it is a waivable defect. See, *Id.* at 787 ("If a plaintiff initially could have filed his action in federal court, yet chose to file in state court, even if a statutory provision prohibits the defendant from removing the action and the defendant removes despite the statutory proscription against such a removal, the plaintiff must object to the improper removal within thirty days after the removal, or he waives the objection"). Accordingly, the Court finds that Plaintiff has waived any right to object to removal on the basis of § 77v.

905 F.2d 769, 771–72 (4th Cir.1990). For the purposes of ruling on a motion under Rule 12(b)(6), the Court must accept the allegations contained in the complaint as true, and must liberally construe the complaint as a whole. *Jenkins v. McKeithen,* 395 U.S. 411, 421, 89 S.Ct. 1843, 1848–49, 23 L.Ed.2d 404 (1969); *Finlator v. Powers,* 902 F.2d 1158 (4th Cir.1990).

■ The parties have submitted materials outside the pleadings for the Court's consideration on some of the issues raised in the motion. As to those issues, the Court will treat this motion as a motion for summary judgment pursuant to Rule 56 of the Federal Rules of Civil Procedure. *See* Fed.R.Civ.P. 12(b). Summary judgment is proper if the evidence before the court establishes that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law. Fed.R.Civ.P. 56(c); *Celotex Corp. v. Catrett,* 477 U.S. 317, 322, 106 S.Ct. 2548, 2552, 91 L.Ed.2d 265 (1986). In assessing such a motion, the Court must view the evidence and all justifiable inferences in the light most favorable to the party opposing the motion. *United States v. Diebold, Inc.,* 369 U.S. 654, 655, 82 S.Ct. 993, 994, 8 L.Ed.2d 176 (1962) (per curiam).

With these principles in mind, the Court will address the arguments presented by the parties.

### B. Violations of the Securities and Commodities Acts

As a preliminary matter, Defendants note that it is an open question whether the "NOB Spread" is a security or a commodity. As stated above, the NOB Spread relates to the relative prices of futures contracts for the purchase of Treasury bonds and Treasury notes. Treasury bonds and notes are both securities. Future contracts, however, are commodities. In *Messer v. E.F. Hutton and Co.,* 847 F.2d 673 (11th Cir.1988), the Eleventh Circuit held that Treasury bond futures should be treated as commodities, not securities, but the court noted in so holding that there was a split of authority on that issue. *Id.* at 676. This Court concludes that it need not resolve this interesting issue because

Plaintiff's allegations do not support a claim under either the securities or commodities regulations.

### 1. 1933 Act

■ Plaintiff alleges that Defendants violated § 12 and § 17 of the 1933 Act. Complaint at ¶ 35. Section 12 of the Act imposes liability for certain acts on the part of "[a]ny person who offers or sells a security." 15 U.S.C. § 77*l.* Section 17(a) is similarly limited to those who offer or sell securities. 15 U.S.C. § 77q(a). Defendants are neither offerers nor sellers.

■ Section 17(b) makes it unlawful for "any person ... to publish, give publicity to, or circulate any notice, circular, advertisement, newspaper, article, letter, investment service, or communication which, though not purporting to offer a security for sale, *describes such a security for a consideration received or to be received, directly or indirectly, from an issuer, underwriter, or dealer, without fully disclosing the receipt ... of such consideration and the amount thereof.*" 15 U.S.C. § 77q(b). While Defendants, as authors and publishers of an investment newsletter, are certainly within the class of persons potentially liable under this subsection, there is no allegation in the Complaint that Defendants received any secret compensation for recommending the NOB Spread to its subscribers. Thus, Plaintiff has failed to state even a colorable claim against Defendants under the 1933 Act.

### 2. Commodities Exchange Act

■ Plaintiff neglects, both in the Complaint and in his Opposition, to identify the particular portion of the Commodities Exchange Act under which he is bringing his claim. Defendants anticipate that the only possible candidate is § 4*o,* 7 U.S.C. § 6*o,* and the Court agrees that this is the only section that could even potentially reach the conduct of which Plaintiff complains. Section 4*o* makes it unlawful for any "commodity trading advisor," by use of any instrument of interstate commerce, "to employ any device, scheme, or artifice to defraud" or "to engage in any transaction, practice, or course of

business which operates as a fraud." 7 U.S.C. § 6*o* (1). Plaintiff's only hope to state a claim under this section, however, depends on his ability to establish that Defendants were "commodity trading advisors." This he cannot do under the relevant case law.

Prior to the 1992 legislation that reorganized the definitional section of the CEA, the definition of "commodity trading advisor" specifically excluded "the publisher of any bona fide newspaper, news magazine, or business or financial publication of general and regular circulation including their employees." 7 U.S.C. § 2(a)(1)(A)(iv).[3] In *Lowe v. SEC*, 472 U.S. 181, 105 S.Ct. 2557, 86 L.Ed.2d 130 (1985), the Supreme Court discussed and interpreted identical language contained in the Investment Advisors Act of 1940 ["IAA"] excluding "bona fide publications" from the definition of investment advisors to be regulated under the IAA. *See* 15 U.S.C. § 80b–2(a)(11)(D). At issue in *Lowe* were three publications. The first was a newsletter, sent to between 3,000 to 19,000 subscribers, which "contained general commentary about the securities and bullion markets, reviews of market indicators and investment strategies, and *specific recommendations for buying, selling, or holding stocks and bullion.*" *Lowe*, 472 U.S. at 185, 105 S.Ct. at 2560 (emphasis added). A second newsletter offered similar information on lower priced stocks to 278 paid subscribers. *Id.* at 185 n. 7, 105 S.Ct. at 2560 n. 7. A third publication was to provide informational charts on the performance of various securities, without providing any specific investment advice. *Id.*

In concluding that the publishers of these newsletters fell within the "bona fide publications" exception to the definition of investment advisors, the Court observed:

The [IAA] was designed to apply to those persons engaged in the investment-advi-

sory profession—those who provide *personalized advice attuned to a client's concerns,* whether by written or verbal communication. The mere fact that a publication contains advice and comment about specific securities does not give it the personalized character that identifies a professional investment advisor. Thus, petitioners' publications do not fit within the centralized purpose of the [IAA] because they do not offer *individualized advice attuned to any specific portfolio or to any client's particular needs.* On the contrary, they circulate for sale to the general public at large in a free, open market...."

As long as the communications between [the publishers] and their subscribers remains entirely impersonal and do not develop into the kind of fiduciary, person-to-person relationships that were discussed at length in the legislative history of the Act and that are characteristic of investment advisor-client relationships, we believe the publications are, at least presumptively, within the exclusion....

*Id.* at 208, 210, 105 S.Ct. at 2572, 2573 (emphasis added).

In the instant action, the publication at issue clearly falls within the same exception. The Journal is marketed to the general public and, in May of 1993, was sent to between 6,800 and 7,200 subscribers. *See* Affidavit of Ricky Popowitz at ¶ 2.[4] A review of the two issues of the Journal attached to the Complaint reveals the same kinds of impersonal commentary, information and recommendations described in *Lowe*. Plaintiff presents no facts that would indicate that Defendants were providing him with "individualized advice attuned [to his] specific portfolio [or his] particular needs."

---

**3.** This exclusion to the definition of "commodity trading advisor" is now found in 7 U.S.C. § 1a(5)(B)(iv) which excludes, "the publisher or producer of any print or electronic data of general and regular dissemination, including its employees." Congress made it clear that, in reorganizing this section under the 1992 Amendments to the CEA, that no substantive change in the law was intended. *See* 1992 U.S. Cong.Code and Admin.News 3103, 3150.

**4.** Plaintiff asserts that the number of subscribers is "less than 1500." Opposition at 8. Apparently, that was the number of subscribers at the time Pugsley entered into the original publishing agreement with Phoenix. *See* Motion to Dismiss, Exhibit 1.

The only support for Plaintiff's conclusion that the Journal was not entitled to the exclusion is a citation to a 1985 decision of the Eastern District of Virginia, *SEC v. Financial News Assoc.*, 1985 WL 25023 (E.D.Va. April 26, 1985). In *Financial News,* the court concluded that publishers of a newsletter similar to the Journal were "investment advisors" under the terms of the IAA. *Id.* at *8. What Plaintiff ignores, however, is that in reaching that conclusion, the court relied heavily on *SEC v. Lowe,* 725 F.2d 892 (2d Cir.1984), the Second Circuit decision overturned by the Supreme Court one month after the Eastern District of Virginia's decision in *Financial News.* Defendants note that the court vacated its decision in *Financial News* on June 21, 1985, after the Supreme Court's June 10, 1985 decision in *Lowe. See* Reply Exhibit 1 (*Financial News* docket sheet).

Because Defendants are not "investment advisors" as defined under the relevant securities and commodities regulations, the Court finds that Plaintiff cannot maintain a claim under the CEA.

### 3. Maryland Securities Act

■ Plaintiff's claim under the Maryland Securities Act, Md. Corp. & Ass'ns Code Ann. § 11–101 *et seq.,* fails for reasons similar to the failure of his claim under the CEA. Plaintiff claims that Defendants violated § 11–401 of the MSA. That section makes it unlawful for a person to transact business as an "investment advisor" without registering under the MSA. It is even clearer under the MSA, than under the IAA or the CEA, however, that Defendants are not included in the definition of "investment advisors."

Incorporating the *Lowe* decision into the language of the federal statutes, the MSA specifically excludes from the definition of investment advisors the "publisher of any bona fide newspaper, news column, newsletter, news magazine, or business or financial publication or service ... that does not consist of the rendering of advice *on the basis of the specific investment situation of each client." Id.* § 11–101(f)(2)(v) (emphasis added). In the instant action, Plaintiff makes no claim that Defendants offered advice directed to "his specific investment situation." The Journal is precisely the type of publication intended to be excluded from the reach of the MSA.

### C. Common Law Claims

■ Recognizing that there is little or no case law supporting the extension of common law tort liability in this context, Plaintiff urges the Court to adopt and apply Section 552 of the Restatement (Second) of Torts. Section 552 states:

(1) One who, in the course of business, profession or employment, or in any other transaction in which he has a pecuniary interest, supplies false information for the guidance of others in their business transactions, is subject to liability for pecuniary loss caused to them by their justifiable reliance upon the information, if he fails to exercise reasonable care or competence in obtaining or communicating the information.

(2) ... the liability stated in Subsection (1) is limited to loss suffered

(a) by the person or one of a limited group of persons for whose benefit and guidance he intends to supply the information or knows that the recipient intends to supply it, and

(b) through reliance upon it in a transaction that he intends the information to influence or knows that the recipient so intends or in a substantially similar transaction.

Restatement (Second) of Torts § 552 (1977).

In *Gutter v. Dow Jones, Inc.,* 22 Ohio St.3d 286, 490 N.E.2d 898 (1986), the Supreme Court of Ohio considered, and rejected, the application of § 552 in a factual situation similar to that raised in the instant case. In *Gutter,* the plaintiff brought an action against the publisher of the Wall Street Journal alleging that he suffered a financial loss after investing in certain corporate bonds in reliance on incorrect information negligently published by the newspaper. The trial court dismissed the complaint but the intermediate appellate court reversed. On the appeal of that decision, the Supreme Court of Ohio defined the question before it as follows:

"whether a general circulation newspaper is liable to one of its subscribers or readers for a non-defamatory negligent misrepresentation of fact in a news article relied on by the reader in choosing a securities investment which results in a financial loss because of a market decline." *Id.* 490 N.E.2d at 899.

In distinguishing the case before it from other recent decisions which did extend liability for negligent misrepresentations, the court looked to the limiting language of Section 552. The court concluded that "as a newspaper reader, appellee does not fall within a special limited class (or group) of foreseeable persons as set forth in Section (2)(a) [of Section 552]." *Id.* at 900. The court expressed the concern that to extend liability in this context would " 'have a staggering deterrent effect on potential purveyors of printed material.' " *Id.* at 900 n. 3 (quoting *De Bardeleben Marine Corp. v. United States,* 451 F.2d 140, 148 (5th Cir. 1971)).

A similar result was reached in *Daniel v. Dow Jones & Company, Inc.,* 137 Misc.2d 94, 520 N.Y.S.2d 334 (N.Y.Civ.Ct.1987). In *Daniel,* the plaintiff was a subscriber to an "on line" financial news service. The plaintiff subscriber alleged that a news service report contained false and misleading information regarding a particular investment that he relied on in making what proved to be an unprofitable investment decision. In granting the motion to dismiss the plaintiff's claims against the news service, the *Daniel* court, like the court in *Gutter,* focused on the chilling effects of such widespread liability. Under Section 552, the court observed, "as a matter of public policy, the class of potential plaintiffs must be carefully circumscribed to avoid the potential for unlimited liability." *Id.* 520 N.Y.S.2d at 336.

In addition to concerns of unlimited liability, the courts in both *Gutter* and *Daniel* based their holdings, in part, on First Amendment concerns. Both courts noted the general rule precluding the imposition of liability for nondefamatory, negligently untruthful reporting. *Gutter,* 490 N.E.2d at

900; *Daniel,* 520 N.Y.S.2d at 339. A contrary rule, allowing liability for negligent errors, would impose on the press the "intolerable burden" of demonstrating to the finder of facts that its efforts to determine the accuracy of any given report were reasonable. *Daniel,* 520 N.Y.S.2d at 339 (citing *Time Inc. v. Hill,* 385 U.S. 374, 87 S.Ct. 534, 17 L.Ed.2d 456 (1967)). This "intolerable burden" would necessarily run counter to "[t]he societal right to free and unhampered dissemination of information" embodied by the First Amendment. *Daniel,* 520 N.Y.S.2d at 339 (citing *Gertz v. Robert Welch, Inc.,* 418 U.S. 323, 94 S.Ct. 2997, 41 L.Ed.2d 789 (1974)).

In light of these dual concerns expressed in *Gutter* and *Daniel* and other similar decisions,[5] the only question remaining is whether there is some meaningful basis to distinguish "John Pugsley's Journal" from the publications at issue in those decisions. The Court concludes that there is not. Although the Journal may be less recognized and may have a smaller circulation than those publications, the relationship between the publication and its subscribers is still the same. The publication is offered to the general public and the information provided in the publication is of a general nature, that is, it is not specifically tailored to financial situation of any individual subscriber.

In *Daniel,* subscription newsletters, such as the Journal, were specifically equated with the on-line news service at issue. The court opined, "[t]here is no functional difference between defendant's service and the distribution of a moderate circulation newsletter *or subscription newsletter* . . . . [P]laintiff purchased defendant's news reports as did thousands of others. The 'special relationship' required to allow an action for negligent misstatements must be greater than that between the ordinary buyer and seller." 520 N.Y.S.2d at 337. Similarly, this Court concludes that there was no "special relationship" between Defendants and Plaintiff on which to base tort liability.

Furthermore, while the issue is typically raised in different contexts, there is consider-

---

5. *See Alm v. Van Nostrand Reinhold Co, Inc.,* 134 Ill.App.3d 716, 89 Ill.Dec. 520, 480 N.E.2d 1263 (1985) (holding no liability for negligent errors in

instructions in "how to" book for plaintiff allegedly injured while following those instructions).

able authority, including authority from this Court, for the proposition that investment newsletters are subject to the same protection under the First Amendment as any other publication. *See Lowe v. SEC*, 472 U.S. 181, 210, 105 S.Ct. 2557, 2573, 86 L.Ed.2d 130 (1985) (holding publication containing factual information and commentary on general market conditions and trends entitled to First Amendment protection); *National Life Ins. Co. v. Phillips Publishing, Inc.*, 793 F.Supp. 627 (D.Md.1992) (holding in a defamation suit that "Profitable Investing," a financial newsletter, was entitled to the "actual malice" standard because of First Amendment concerns); *SEC v. Hirsch Org., Inc.*, 8 Media L.Rep. 2421 (BNA), 1982 WL 1343 (S.D.N.Y. 1982) (finding First Amendment rights implicated in SEC investigation of "Smart Money," a financial newsletter sent to 9000 subscribers). *See generally, Lovell v. City of Griffin*, 303 U.S. 444, 452, 58 S.Ct. 666, 669, 82 L.Ed. 949 (1938) ("The press in its historic connotation comprehends every sort of publication which affords a vehicle of information and opinion.").

In light of these considerations, the Court finds that there is no basis on which to impose tort liability on Defendants for the alleged negligent misstatements contained in the Journal. Accordingly, Plaintiff's common law tort claims also must be dismissed.

## IV. CONCLUSION

For all of the above stated reasons, the Court finds that Defendants are entitled to judgment as to each of the claims asserted in the Complaint and that this case should be dismissed. A separate order will be issued.

### ORDER

In accordance with the foregoing Memorandum and for the reasons stated therein, IT IS this 14th day of November, 1995, by the United States District Court for the District of Maryland, ORDERED:

1. That Defendants' Motion to Dismiss (Paper No. 7) is hereby GRANTED;

2. That this case is hereby DISMISSED;

3. That this case is hereby CLOSED; and

4. That the Clerk of the Court shall mail copies of the foregoing Memorandum and this Order to all counsel of record.