

# COURT OF APPEALS

## SECOND DISTRICT OF TEXAS
### FORT WORTH

### NO. 02-10-00229-CV

MICHAEL MURPHY                                                    APPELLANT

V.

ERNEST REYNOLDS III                                              APPELLEE

------------

## FROM THE 17TH DISTRICT COURT OF TARRANT COUNTY

------------

## MEMORANDUM OPINION[1]

------------

## I. Introduction

In five issues, a media defendant, Appellant Michael Murphy, brings this interlocutory appeal, asserting that the trial court erred by partially denying his motion for summary judgment. *See* Tex. Civ. Prac. & Rem. Code Ann. § 51.014(a)(6) (West 2008). We are constrained to reverse and render.

---

[1]*See* Tex. R. App. P. 47.4.

## II. Factual and Procedural History

Appellee Ernest Reynolds, III sued Murphy, a technology-sector stock analyst and author of a newsletter, book, and telephone "hotline," for losses incurred from investments Reynolds made based on recommendations in Murphy's newsletter, *Technology Investing*. The parties have appeared before this court on three prior occasions related to different aspects of the underlying lawsuit. *See Reynolds v. Murphy* (*Reynolds III*), 266 S.W.3d 141 (Tex. App.—Fort Worth 2008, pet. denied); *In re Reynolds* (*Reynolds II*), No. 02-07-00256-CV, 2007 WL 2460279 (Tex. App.—Fort Worth Aug. 31, 2007, orig. proceeding); *Reynolds v. Murphy* (*Reynolds I*), 188 S.W.3d 252 (Tex. App—Fort Worth 2006, pet. denied) (op. on reh'g) (containing a detailed factual history of the case), *cert. denied*, 549 U.S. 1281 (2007).

In April 2010, after our opinion in *Reynolds III*, Reynolds filed his fourth amended petition in which he sought damages and attorneys' fees and claimed that Murphy (1) violated Texas Business and Commerce Code section 27.01, articles 581-33 and 581-33-1 of the Texas Securities Act (TSA), and National Association of Securities Dealers (NASD) rules; (2) breached a fiduciary duty to Reynolds; (3) committed common law fraud (the surviving claim from our disposition of *Reynolds I*); and (4) committed negligence, gross negligence, and negligence per se. After the parties conducted discovery, Murphy filed a motion for a traditional and a no-evidence summary judgment and a supplemental summary judgment motion on all of Reynolds's claims, to which Reynolds

2

responded. After overruling each party's objections to summary judgment evidence, the trial court granted Murphy summary judgment on Reynolds's negligence and gross negligence claims but denied summary judgment on Reynolds's first three claims. This interlocutory appeal followed,[2] with Murphy asserting that his motions should have been granted as to all of Reynolds's claims.

### III. Summary Judgment

In his third and fourth issues, Murphy argues that the trial court erred by denying his motion for summary judgment on Reynolds's nonnegligence claims because (1) Murphy was not an investment advisor and was not a primary violator or aider and abettor in the sale or purchase of stock, thus, he did not violate business and commerce code section 27.01, TSA articles 581-33 or 581-33-1, or NASD rules; (2) Murphy did not owe a fiduciary duty to Reynolds, and (3) Reynolds's fraud claims were barred by limitations or, in the alternative, Reynolds's fraud claims fail as a matter of law because Reynolds neither met his burden to show that Murphy made any material misrepresentations or his burden to show that Murphy's actions caused him damage.[3]

---

[2]Although Reynolds challenges our jurisdiction to hear Murphy's appeal, we have previously ruled on this matter by denying his prior motion to dismiss the appeal.

[3]In his eighth issue, Murphy complains that the trial court erred by overruling his objections to Reynolds's affidavit as summary judgment evidence, which we review under an abuse of discretion standard. *Nat'l Liab. & Fire Ins. Co. v. Allen*, 15 S.W.3d 525, 527–28 (Tex. 2000). However, we need not

3

## A. Standard of Review

In this summary judgment case, the issue on appeal is whether Murphy met the summary judgment burden by establishing that no genuine issue of material fact existed and that he was entitled to judgment as a matter of law. Tex. R. Civ. P. 166a(c); *Mann Frankfort Stein & Lipp Advisors, Inc. v. Fielding*, 289 S.W.3d 844, 848 (Tex. 2009). We review his summary judgment de novo. *Travelers Ins. Co. v. Joachim*, 315 S.W.3d 860, 862 (Tex. 2010).

We consider the evidence presented in the light most favorable to Reynolds, crediting evidence favorable to him if reasonable jurors could, and disregarding evidence contrary to him unless reasonable jurors could not. *Mann Frankfort*, 289 S.W.3d at 848. We indulge every reasonable inference and resolve any doubts in Reynolds's favor. *20801, Inc. v. Parker*, 249 S.W.3d 392, 399 (Tex. 2008). Murphy, as defendant below, was entitled to summary judgment on an affirmative defense to Reynolds's claims if he conclusively proved all the elements of his asserted affirmative defense. *Frost Nat'l Bank v. Fernandez*, 315 S.W.3d 494, 508–09 (Tex. 2010), *cert. denied*, 131 S. Ct. 1017 (2011); *see* Tex. R. Civ. P. 166a(b), (c). To accomplish this, Murphy must have presented summary judgment evidence that conclusively established each

---

determine if the trial court abused its discretion because, as we set forth herein, Reynolds did not raise a fact issue on Murphy's summary judgment grounds even with the trial court admitting that evidence. *See* Tex. R. App. P. 47.1; *see also Reynolds I*, 188 S.W.3d at 261–62 (summarizing Reynolds's affidavit).

4

element of his affirmative defense.  *See Chau v. Riddle*, 254 S.W.3d 453, 455 (Tex. 2008).

In the no-evidence motion, Murphy, as defendant below and the party without the burden of proof, moved for summary judgment on the ground that there was no evidence to support an essential element of Reynolds's claims. *See* Tex. R. Civ. P. 166a(i).  The motion was required to specifically state the elements for which there was no evidence, and the trial court was required to grant the motion unless Reynolds produced summary judgment evidence that raised a genuine issue of material fact as to those issues.  *See id.* & cmt.; *Timpte Indus., Inc. v. Gish*, 286 S.W.3d 306, 310 (Tex. 2009); *Hamilton v. Wilson*, 249 S.W.3d 425, 426 (Tex. 2008).

When reviewing this no-evidence summary judgment, we examine the entire record in the light most favorable to Reynolds, indulging every reasonable inference and resolving any doubts against the motion.  *See Sudan v. Sudan*, 199 S.W.3d 291, 292 (Tex. 2006).  We review this no-evidence summary judgment for evidence that would enable reasonable and fair-minded jurors to differ in their conclusions.  *See Hamilton*, 249 S.W.3d at 426 (citing *City of Keller v. Wilson*, 168 S.W.3d 802, 822 (Tex. 2005)).  We credit evidence favorable to Reynolds if reasonable jurors could, and we disregard evidence contrary to Reynolds unless reasonable jurors could not.  *See Timpte Indus.*, 286 S.W.3d at 310 (quoting *Mack Trucks, Inc. v. Tamez*, 206 S.W.3d 572, 582 (Tex. 2006)).  If Reynolds brought forward more than a scintilla of probative evidence that raised

5

a genuine issue of material fact, then a no-evidence summary judgment was not proper. *Smith v. O'Donnell*, 288 S.W.3d 417, 424 (Tex. 2009); *King Ranch, Inc. v. Chapman*, 118 S.W.3d 742, 751 (Tex. 2003), *cert. denied*, 541 U.S. 1030 (2004).

## B. Article 581-33-1: Investment Advisor

In his third issue, Murphy asserts that because he is not an "investment advisor" as defined by TSA article 581-4(N), the trial court erred by denying his motion for summary judgment on Reynolds's article 581-33-1 claim.[4]   In his motion, Murphy asserted that he was an *author* of a bona-fide publication and not an "investment advisor" for purposes of the TSA.

### 1. Applicable Law

Article 581-33-1 outlines the civil liability that investment advisors have to their clients. *See* Tex. Rev. Civ. Stat. Ann. art. 581-33-1 (West Supp. 2010). Article 581-4(N), added in 2001, mirrors the federal Investment Advisors Act's (IAA) definition, and defines "investment advisor" to

> [i]nclude[ ] a person who, for compensation, engages in the business of advising another, either directly or through publications or writings, with respect to the value of securities or to the advisability of investing in, purchasing, or selling securities or a person who, for compensation and as part of a regular business, issues or adopts

---

[4]Although we usually address the no-evidence motion first when both no-evidence and traditional summary judgment motions are filed, *see Ford Motor Co. v. Ridgway*, 135 S.W.3d 598, 600 (Tex. 2004), we will review the propriety of granting the traditional summary judgment on Murphy's article 581-33-1 claim first because it is dispositive. *See* Tex. R. App. P. 47.1.

analyses or a report concerning securities, as may be further defined by Board rule. The term does not include:

. . . .

(4) the publisher of a bona fide newspaper, news magazine, or business or financial publication of general or regular circulation[.]

*Id.* art. 581-4(N) (West 2010); *see also* 15 U.S.C.A. § 80b-2(a)(11) (West 2009); House Research Org., Bill Analysis, Tex. H.B. 2255, 77th Leg., R.S. (2001) (indicating that the addition codified, but did not alter, the Texas Securities Board's existing rules and exemptions regarding the regulation of investment advisors). Oversight of investment advisors is split between state and federal authorities. *See* 15 U.S.C.A. § 80b-3a (West 2009). Any entity or person qualifying for an exemption under the federal definition of investment advisor is statutorily exempt from state registration. *See id*. § 80b-3a(b)(1)(B) (noting that an entity exempt under § 80b-2(a)(11) is not subject to state registration, licensing, or qualification).

Consistent then with article 581-4(N)(4), we will examine whether Murphy (a) was a publisher (b) of a bona fide financial publication (c) of general circulation.[5] We revisit *Lowe v. Securities & Exchange Commission*, 472 U.S. 181, 105 S. Ct. 2557 (1985), for guidance. *See Reynolds I*, 188 S.W.3d at 263 (quoting *Lowe*, 472 U.S. at 183, 105 S. Ct. at 2559). As we noted in *Reynolds I*, the issue in *Lowe* "was whether the Securities and Exchange Commission . . .

---

[5]*Reynolds I* held that as a matter of law, *Technology Investing* is a general circulation publication. *See* 188 S.W.3d at 266–67.

7

could obtain a permanent injunction under the federal Investment Advisors Act (IAA) . . . [against an unregistered *publisher*, in order to stop] publication of securities newsletters containing 'nonpersonalized investment advice and commentary.'"[6]  *See id*.  The Supreme Court concluded that Lowe's publications met the statutory exemption, holding that they did "not fit within the central purpose of the [IAA] because they [did] not offer *individualized advice* attuned to any specific portfolio or to any client's particular needs," and that Lowe—a publisher—was not an "'investment advisor' as defined by the act."  *Lowe*, 472 U.S. at 208–11, 105 S. Ct. at 2572–2573 (emphasis supplied).  In reaching its conclusion, the Supreme Court reviewed the publications to determine if they were of "general and regular circulation" and ultimately concluded that *impersonal, nonindividualized communications* "do not develop into the kind of fiduciary, person-to-person relationships . . . that are characteristic of investment advisor-client relationships," and are thus presumed to be exempt and not subject to registration under the IAA.  *Id*., 105 S. Ct. at 2572–73.  It is axiomatic to say that we are required to follow this reasoning, and having previously held that Murphy's newsletter was of general circulation like those found in *Lowe*, *see Reynolds I*, 188 S.W.3d at 266–67, we must determine whether Murphy—an author—falls under the IAA's definition of "publisher" and whether Murphy's newsletter qualifies as "bona fide" within the meaning of the statute.

---

[6]In *Reynolds I*, Reynolds acknowledged that *Lowe* was based solely on the Supreme Court's construction of the IAA.  *See* 188 S.W.3d at 265 n.19.

### a. "Publisher"

In his response, Reynolds argues that the denial of summary judgment was proper because the exemption does not apply to Murphy. Specifically, Reynolds argues that we must strictly construe the statute, including the term "publisher," and therefore because Murphy admitted that he provided investment advice and that he was an author, and hence not a publisher, he is an investment advisor under the statute.

We first note that in the "admissions" Reynolds references, Murphy stated that he provided "general investment advice, . . . not personalized." And, even though in his deposition Murphy indicated that he was not a publisher, his "admission" is not determinative of the legal effect of any distinction between author and publisher.

The Supreme Court has emphasized that "Congress intended the [IAA] to be construed like other securities legislation 'enacted for the purpose of avoiding frauds,' not technically and restrictively, but flexibly to effectuate its remedial purposes." *SEC v. Capital Gains Research Bureau, Inc.*, 375 U.S. 180, 195, 84 S. Ct. 275, 284–85 (1963) (footnote omitted). The TSA is both penal and remedial, but when the TSA is invoked to enforce a remedy, it should be considered as a remedial and not a penal statute. *See Dempsey-Tegler & Co., v. Flowers*, 465 S.W.2d 208, 211 (Tex. Civ. App.—Beaumont), *rev'd on other grounds*, 472 S.W.2d 112 (Tex. 1971). And, even if strict construction was required as Reynolds asserts, strict construction of the statute does not mean

9

isolating terms or phrases from the context in which they appear. *Thomas v. State*, 919 S.W.2d 427, 430 (Tex. Crim. App. 1996)*; see also Bruner v. State*, 463 S.W.2d 205, 215 (Tex. Crim. App. 1970) (concluding that the TSA's highly penal nature requires that the act be strictly construed). Neither does a strict construction mean that we ignore the plain meaning of terms. *See Thomas*, 919 S.W.2d at 430 (citing *SEC v. C.M. Joiner Leasing Corp.*, 320 U.S. 344, 355, 64 S. Ct. 120, 125 (1943) ("The rule of strict construction is not violated by permitting the words of the statute to have their full meaning, or the more extended of two meanings, as the wider popular instead of the more narrow technical one . . . .") (quoting *United States v. Hartwell*, 73 U.S. (6 Wall.) 385, 396 (1867))).

In *Reynolds I*, we discussed *Ginsburg v. Agora, Inc.*, 915 F. Supp. 733 (D. Md. 1995), a federal case applying *Lowe* to facts similar to ours. *See Reynolds I*, 188 S.W.3d at 264–67. In *Ginsburg*, which involved an author, the court applied *Lowe* to determine that the IAA "was designed to apply to those persons . . . who provide *personalized advice attuned to a client's concerns*, . . . [and] offer *individualized advice attuned to any specific portfolio or to any client's particular needs*." *Ginsburg*, 915 F. Supp. at 737. The court then concluded that because a newsletter was generalized in nature, contained impersonal commentary, and did not provide "individualized advice attuned [to the plaintiff's] specific portfolio [or his] particular needs," the publication was not subject to the IAA, and that, by

10

extension, the newsletter's author was not an "investment advisor." 915 F. Supp. at 737; *see Reynolds I*, 188 S.W.3d at 264–65 & n.14.

Here, *Ginsburg*'s analysis and holding apply to the determination of whether an author, such as Murphy, qualifies as an investment advisor under the IAA.[7] We must agree with *Ginsburg's* analysis and holding, and we hold that an author is included within the term "publisher" found in the IAA's definition of "Investment Advisor" when the author is not offering personalized advice to individual investors. Accordingly, we conclude that if Murphy's *Technology Investing* newsletter is a bona fide publication, it qualifies for the exemption found in 15 U.S.C.A. § 80b-2(a)(11) pursuant to *Ginsburg* and *Lowe*, and therefore, pursuant to 15 U.S.C.A. § 80b-3a(b)(1)(B), Murphy was not required to register as an investment advisor under the TSA.

### b. Bona Fide

In *Lowe*, the Supreme Court determined that the term "bona fide" applied to the publication and not to the publisher and that the term translated best to "genuine." It then assessed Lowe's publications to determine if they contained false or misleading information or if they touted any security in which Lowe had an interest. *Lowe*, 472 U.S. at 208, 105 S. Ct. at 2572. The Supreme Court noted that to "the extent that the [newsletters] contain[ed] factual information

---

[7]In *Reynolds I*, we discussed and adopted *Ginsburg* relative to First Amendment protection from negligence and negligent misrepresentation claims. *See* 188 S.W.3d at 263–65.

about past transactions and market trends, and the newsletters [commented] on general market conditions, there can be no doubt about the protected character of the communications." *Id*. at 210, 105 S. Ct. at 2573. Federal law prohibits the "touting" of securities, including promoting stock in exchange for compensation, without disclosing the nature and amount of compensation paid. *See* 15 U.S.C.A. § 77q(b) (West 2009); *SEC v. Liberty Capital Grp., Inc.*, 75 F. Supp. 2d 1160, 1162 (W.D. Wash. 1999).

In response to Murphy's summary judgment motion, Reynolds argued that Murphy (1) misled Reynolds as to his credentials, analysis, methodology, and past performance as a fund manager; (2) failed to disclose that he authored other investing newsletters that contradicted his advice in *Technology Investing*; (3) "touted" his professional expertise and the stocks he recommended; and (4) failed to disclose his criminal background.

Murphy's criminal background is not relevant to determining whether the newsletter is a "bona fide" publication. *See Lowe*, 472 U.S. at 208, 105 S. Ct. at 2572 (noting that the term "bona fide" pertains to the publication, not the publisher, and therefore the publisher's unsavory history would not prevent the newsletter from being "bona fide"). Thus, we must determine (1) whether the newsletter violated section 77q(b) by touting securities and (2) whether the newsletter was disqualified from being bona fide because it contained false or misleading statements—either about Murphy's credentials, analysis, methodology, or fund management performance or by failing to disclose

12

Murphy's authorship of other investing newsletters containing advice contradicting the advice provided in *Technology Investing*.

Although Reynolds alleged that Murphy "touted" securities, nothing in the record shows or allows an inference that Murphy received compensation from the companies he recommended or that he personally gained by promoting the companies discussed in the newsletter. *See* U.S.C.A. § 77q(b); *see, e.g., U.S. SEC v. Park*, 99 F. Supp. 2d 889, 894–95 (N.D. Ill. 2000) (noting that "touting" occurred when an investment newsletter publisher failed to disclose ownership of, and subsequent profits on, the stocks he recommended); *Liberty Capital Grp., Inc.*, 75 F. Supp. 2d at 1162 (finding "touting" when publisher of electronic and print stock recommendations failed to disclose compensation received from companies he recommended). Therefore, Reynolds failed to raise an issue of material fact to show that Murphy "touted" securities in a manner sufficient to bring him under the IAA's purview.

In his petition, Reynolds alleged that the newsletter falsely represented Murphy's expertise, methodology, success rates, and the security of investments made based on Murphy's recommendations. The record contains copies of the advertisements and newsletters that (1) outline Murphy's experience, (2) contain investment result excerpts, (3) provide third-party quotations, recommendations, and success stories, and (4) include articles authored by Murphy on various topics related to technology sector investing. Although Reynolds asserted that Murphy had an overall dismal record as a fund manager, nothing in the record

13

refutes the validity of the performance summaries listed in the newsletters or shows that the endorsements and third-party success stories were manufactured or false. Additionally, Reynolds does not direct us to any specific claim of return or guaranteed result to support his claim that Murphy's methodologies were inaccurate. Rather, the record reflects that Murphy's newsletters stated that his analysis incorporated a model accounting for and leveling technology company research funding and that Murphy did in fact develop and utilize such a model in his recommendations.

Further, in his response to Murphy's summary judgment motion, Reynolds asserted that Murphy's promotional materials falsely claimed that Murphy was a "millionaire maker" and a "hugely successful" investment fund manager, but Reynolds cited no particular page or pages in which these statements could be found in the ninety-page appendix attached to his response, which contained copies of the newsletter and promotional materials. *See* Tex. R. Civ. P. 166(a)(i) & 1997 cmt.; *Rogers v. Ricane Enters., Inc.*, 772 S.W.2d 76, 81 (Tex. 1989) (noting that neither the trial court nor reviewing courts are required to wade through a voluminous record to marshal respondent's proof). And, simply pointing out these statements does not provide any evidence raising a fact issue as to whether they were false. Reynolds also does not point to any instance in which Murphy promised him individually a specific rate of return or that his investments would be one-hundred percent secure; instead, the record shows that Murphy made generalized assertions as to investment opportunities,

14

performance, and expected or estimated returns—essentially, Murphy gave his opinion as to future market events. Therefore, Reynolds's summary judgment response evidence is insufficient to raise a fact issue on his section 581-33-1 claim. *See Guthrie v. Suiter*, 934 S.W.2d 820, 826 (Tex. App.—Houston [1st Dist.] 1996, no writ) (noting that attaching entire document to a response and referencing it only generally does not eliminate a party's responsibility to point out to the trial court where in the document the issues set forth in the response are raised).

Reynolds also claimed that Murphy's failure to disclose authorship of other investment publications that advised subscribers to sell short, while at the same time he advised *Technology Investing* subscribers to avoid selling short, violated section 581-33-1. We previously addressed this same claim in *Reynolds I*, wherein we noted that Murphy's recommendations were not misleading because the investment approaches between the various newsletters differed and that *Technology Investing* "consistently emphasize[d] the long-term investment approach . . . as opposed to more aggressive or short-term methods advocated by Murphy in different contexts." *Reynolds I*, 188 S.W.3d at 274. Thus, Reynolds has failed to produce a fact issue to support his section 581-33-1 claim that Murphy's advice contradicted the long-term investment approach outlined in *Technology Investing*.

For the reasons set out above, we conclude that Murphy's *Technology Investing* newsletter is a bona fide publication as defined by the IAA, and by extension the TSA. Therefore, because Reynolds did not show that there is a genuine issue of material fact regarding whether Murphy is anything other than an author entitled to the protection of a publisher of a bona fide publication of general circulation in response to Murphy's summary-judgment evidence, Murphy was entitled to a traditional summary judgment as a matter of law because he proved that he is not subject to registration as an investment advisor under the IAA, and by extension under the TSA. *See* 15 U.S.C.A. § 80b-3a(b)(1)(B); *Ginsburg*, 915 F. Supp. at 738. We sustain the portions of Murphy's third issue relative to Reynolds's claims arising under TSA article 581-33-1.

## C. Article 581-33 and NASD Rules Violation Claims

Reynolds's petition alleged that Murphy was "liable to [Reynolds] pursuant to Art. 581-33, Texas Statutes (Texas Blue Sky Law), . . . . [And] [a]t all times material, [Murphy] was also an 'aider and abettor' under Art. 581-33 . . . ." We construe Reynolds's petition to claim that Murphy was either primarily liable under article 581-33A(2) or secondarily liable as an aider and abettor under article 581-33F(2). *See* Tex. Rev. Civ. Stat. Ann. art. 581-33-1. In his fourth issue, Murphy argues that the trial court erred by denying his motion for summary judgment because there was no evidence to prove that Murphy made a material misrepresentation or omitted a material fact or that a primary violation of

16

securities laws occurred, necessary elements of both of Reynolds's article 581-33 claims. *See* Tex. R. Civ. P. 166a(i).

### 1. Applicable Law

The Texas Securities Act establishes both primary and secondary liability for securities violations. *Sterling Trust Co. v. Adderley*, 168 S.W.3d 835, 839 (Tex. 2005). Primary liability arises when a person "offers or sells a security . . . by means of an untrue statement of a material fact or an omission to state a material fact necessary in order to make the statements made, in the light of the circumstances under which they are made, not misleading." *Id.* (quoting Tex. Rev. Civ. Stat. Ann. art. 581-33A(2) (West 2010)). Secondary liability is derivative liability for another person's securities violation; it can attach to either a control person, defined as "[a] person who directly or indirectly controls a seller, buyer, or issuer of a security," or to an aider, defined as one "who directly or indirectly with [an] intent to deceive or defraud or with reckless disregard for the truth or the law materially aids a seller, buyer, or issuer of a security." *Id.* (quoting Tex. Rev. Civ. Stat. Ann. art. 581-33F(1)–(2)). Both control persons and aiders are jointly and severally liable with the primary violator "to the same extent as if [they] were the primary violator." *Id*.

The comments to the 1977 revisions to the TSA contain the notation that article 581-33A(2) "is a privity provision, allowing a buyer to recover from his offeror or seller." Tex. Rev. Civ. Stat. Ann. Art. 581-33, cmt. §§ 33A(1), (2) (West

2010). The comment also notes that "some nonprivity defendants may be reached" under section 33F. *Id.*

To prove aider and abettor liability, the plaintiff must demonstrate:

(1) that a primary violation of the securities laws occurred; (2) that the alleged aider had "general awareness" of its role in this violation; (3) that the actor rendered "substantial assistance" in this violation; (4) that the alleged aider either (a) intended to deceive [the] plaintiff or (b) acted with reckless disregard for the truth of the representations made by the primary violator.

*Frank v. Bear, Stearns & Co.*, 11 S.W.3d 380, 384 (Tex. App.—Houston [14th Dist.] 2000, pet. denied); *see also In re Enron Corp. Sec., Derivatives & ERISA Litig.*, 235 F. Supp. 2d 549, 568 (S.D. Tex. 2002).

## 2. Analysis

Reynolds's petition generally alleged that Murphy violated article 581-33 and that Reynolds purchased stock based on Murphy's violations. Reynolds did not specify which transaction or transactions in the over 125 pages of his brokerage account statements in the record qualified as the primary securities law violation that supported his claim. *See In re Perry*, 404 B.R. 196, 219 (Bankr. S.D. Tex. 2009) (noting that a failed investment is not necessarily a mark of securities fraud actionable under the TSA). Reynolds's petition cited NASD Rule 96-60[8] and New York Stock Exchange Rule Interpretation 90-5[9] to support his

---

[8]Although Reynolds generally alleged that Murphy violated NASD rules, he mentioned only NASD Rule 96-60 in his pleadings.

[9]Reynolds did not attach copies of NASD rule 96-60 or NYSE rule 90-5 to either his petition or his response to Murphy's summary judgment motion.

position that the contents of *Technology Investing* constituted Murphy's recommendations on specific securities and that a recommendation of a specific security qualifies as a transaction. However, because we have determined that Murphy is not an investment advisor and because Reynolds has not alleged or proven that Murphy is a registered securities dealer or broker, Murphy is not subject to NASD or NYSE rules.[10] *See* 15 U.S.C.A. §§ 78f, 78o, 78o-3 (West 2011) (providing statutory authority for the creation of registered securities associations (such as NASD and NYSE) and rules to govern securities exchanges and registered brokers and dealers).

Second, Reynolds also generally alleged that he would not have purchased stock "but for" Murphy's advice, but he provided no evidence that Murphy or another party qualified as a primary violator, that is, that Murphy or another party, such as Reynolds's broker, brokerage firm, or the issuing company, "offered" or "sold" Reynolds the stock in question by means of an untrue statement or omission of a material fact, as required to invoke the protections of article 581-33. *See Flowers v. Dempsey-Tegeler & Co.*, 472 S.W.2d 112, 113, 115 (Tex. 1971) (noting the TSA applies to persons and corporations that *offer or sell* unregistered securities). Moreover, statements of

---

[10]Moreover, even if Murphy were subject to the rules, we are uncertain whether Reynolds would have a private right of action for violations of NASD or NYSE rules. *See Colman v. D.H. Blair & Co.*, 521 F. Supp. 646, 654 (S.D.N.Y. 1981) (noting that even though Appellant was within the class that Congress intended to protect, Appellant did not have a private right of action for NASD and NYSE rules violations).

opinion, including opinions about a security's value, are generally not actionable under article 581-33. *See Aegis Ins. Holding Co., L.P. v. Gaiser*, No. 04-05-00938-CV, 2007 WL 906328, at *6 (Tex. App.—San Antonio Mar. 28, 2007, pet. denied) (mem. op.) (stating that opinion of value of security is generally not actionable); *Tex. Capital Sec., Inc. v. Sandefer*, 58 S.W.3d 760, 776 (Tex. App.—Houston [1st Dist.] 2001, pet. denied) (noting that predictions of increased share prices generally do not amount to actionable misrepresentations). Thus, Reynolds failed to carry his burden under rule 166a(i), and a no-evidence summary judgment was proper on both of Reynolds's theories. *See Kastner v. Jenkins & Gilchrist, P.C.*, 231 S.W.3d 571, 579, 581 (Tex. App.—Dallas 2007, no pet.) (affirming summary judgment in favor of "aider and abettor" when respondent failed to prove primary violation).

We sustain that part of Murphy's fourth issue arising under TSA article 581-33 and NASD rules.

## D. Fiduciary Duty

Murphy also claims in his fourth issue that because he was not subject to any laws giving rise to a fiduciary duty and because prior to filing his lawsuit, "Reynolds had never met or spoken to Murphy[,]" the trial court erred by denying his motion for no-evidence summary judgment on Reynolds's fiduciary duty claims.

20

## 1. Applicable Law

Fiduciary duties arise either from certain formal relationships that are recognized as fiduciary as a matter of law, or from the existence of an informal, "confidential" relationship between the parties. *Ins. Co. of N. Am. v. Morris*, 981 S.W.2d 667, 674 (Tex. 1998). An informal fiduciary duty may arise from a moral, social, domestic, or purely personal relationship of trust and confidence, generally called a confidential relationship. *Hubbard v. Shankle*, 138 S.W.3d 474, 483 (Tex. App.—Fort Worth 2004, pet. denied). A confidential relationship exists when influence has been acquired and abused and confidence has been extended and betrayed. *Hoggett v. Brown*, 971 S.W.2d 472, 488 (Tex. App.—Houston [14th Dist.] 1997, pet. denied). A person is justified in placing confidence in the belief that another party will act in his best interest only when he is accustomed to being guided by the other party's judgment or advice and there exists a long association in a business relationship as well as personal friendship. *Id.* Thus, the relationship must exist prior to and apart from the agreement that is the basis of the suit. *Hubbard*, 138 S.W.3d at 483. Whether a confidential or fiduciary relationship exists is ordinarily a question of fact, and the issue only becomes a question of law when it is one of no evidence. *Crim Truck & Tractor Co. v. Navistar Int'l Transp. Corp.,* 823 S.W.2d 591, 594 (Tex. 1992), *superseded by statute on other grounds as stated in Subaru of Am., Inc. v. David McDavid Nissan, Inc.*, 84 S.W.3d 212, 225–26 (Tex. 2002) (op on reh'g). A party asserting breach of a fiduciary duty must establish the existence of a confidential

or similar relationship giving rise to a fiduciary duty. *See Bado Equip. Co. v. Bethlehem Steel Corp.,* 814 S.W.2d 464, 475 (Tex. App.—Houston [14th Dist.] 1991,no writ) (op. on reh'g).

### 2. Statutory Fiduciary Duties

Because we conclude above that Murphy was not subject to TSA articles 581-33 and 581-33-1, the laws giving rise to the statutory fiduciary duties that Reynolds alleged Murphy violated, we sustain that part of Murphy's fourth issue with respect to Reynolds's statutory-based breach of fiduciary duty claims.

### 3. Informal, or Nonstatutory, Fiduciary Duties

Based on the record before us, the only relationship between the parties involves Reynolds's individual decision to subscribe to *Technology Investing*. Thus, Reynolds failed to show that he had a confidential relationship with Murphy prior to and apart from his subscription to *Technology Investing*. *See Cotten v. Weatherford Bancshares, Inc.*, 187 S.W.3d 687, 698–699 (Tex. App.—Fort Worth 2006, pet. denied) (holding that no informal fiduciary relationship existed when plaintiff did not prove confidential relationship prior to and apart from contract giving rise to his lawsuit). Because Reynolds failed to meet his burden under 166a(i) to show the existence of a fiduciary relationship between the parties giving rise to a duty, we sustain Murphy's fourth issue with respect to Reynolds's informal breach of fiduciary duty claim as well.

## E. Fraud Claims

In his fourth issue, Murphy also argues that because causation is an element of all of Reynolds's claims and because Reynolds cannot prove that Murphy's actions caused Reynolds's injury, the trial court erred by denying his no-evidence motion for summary judgment on all of Reynolds's claims. Thus, we will determine whether a no-evidence summary judgment is proper on Reynolds's remaining claims: common law fraud and fraud under section 27.01.

To prevail on a common law fraud claim, a plaintiff must establish (1) the defendant made a material representation, (2) the representation was false, (3) the defendant either knew the representation was false when made or made it recklessly without any knowledge of its truth and as a positive assertion, (4) the defendant made the representation with the intention that it be acted upon, (5) the representation was in fact relied upon, and (6) damage to the plaintiff resulted. *See Ins. Co. of N. Am.,* 981 S.W.2d at 674; *DeSantis v. Wackenhut Corp.,* 793 S.W.2d 670, 688 (Tex. 1990) (op. on reh'g), *cert. denied,* 498 U.S. 1048 (1991); *Trenholm v. Ratcliff,* 646 S.W.2d 927, 930 (Tex. 1983). Section 27.01 provides for a statutory cause of action for fraud in real estate and stock transactions. *See* Tex. Bus. & Com. Code Ann. § 27.01 (West 2009); *Burleson State Bank v. Plunkett,* 27 S.W.3d 605, 611 (Tex. App.—Waco 2000, pet. denied). The elements of statutory fraud under section 27.01 are essentially identical to the elements of common law fraud except that section 27.01 does not require proof of knowledge or recklessness as a prerequisite to the recovery of

23

actual damages. *See Brush v. Reata Oil & Gas Corp.,* 984 S.W.2d 720, 726 (Tex. App.—Waco 1998, pet denied); *see also Poteet v. Kaiser*, No. 02-06-00397-CV, 2007 WL 4371359, at *5 (Tex. App.—Fort Worth Dec. 13, 2007, pet. denied) (citing *Robbins*'s conclusion that causation is an essential element of fraud in a real estate transaction). "[R]eliance is a necessary element of a statutory fraud claim under section 27.01." *Schlumberger Tech. Corp. v. Swanson*, 959 S.W.2d 171, 182 (Tex. 1997).

Reynolds argues that he "unequivocally testified that acting in reliance upon the fraudulent investment advice provided by Murphy[,] he purchased and held securities in his retirement portfolio that he would not have otherwise purchased or held" and that he liquidated his holdings when he discovered the truth of Murphy's fraudulent operations. But as was noted in *Reynolds I*, Reynolds caused his own losses when he sold stock in 2002 against Murphy's advice to "hold" the recommended stocks long-term. *See Reynolds I*, 188 S.W.3d at 274. Thus, we hold that Reynolds failed to raise a fact issue to show that his reliance on Murphy's statements caused his injury, an essential element of both his section 27.01 and common law fraud claims. Accordingly, we sustain the remainder of Murphy's fourth issue.

## IV. Conclusion

Having sustained Murphy's third and fourth issues, we reverse the trial court's order denying Murphy summary judgment on Reynolds's remaining

24

claims and render a final summary judgment in Murphy's favor on all of Reynolds's remaining claims.[11]

 

 

BOB MCCOY
JUSTICE

PANEL:  LIVINGSTON, C.J.; GARDNER and MCCOY, JJ.

DELIVERED:  September 29, 2011

---

[11]Based on our disposition of Murphy's third and fourth issues, we do not reach his remaining issues.  *See* Tex. R. App. P. 47.1.